UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                        :

IN THE MATTER OF ARBITRATION     :
                        :

      -between-         :
                        :     15 Civ. 9766

ICC CHEMICAL CORPORATION,    :
                        :

          Petitioner,    :     **Oral Argument Requested**
                        :

      -and-          :
                        :

NORDIC TANKERS TRADING A/S,    :
                        :

          Respondent,   :
                        :
------------------------------------------------------------X

## ICC'S MEMORANDUM IN SUPPORT OF PETITION TO VACATE ARBITRATION AWARD

      The Petitioner, ICC Chemical Corporation, Charterer ("ICC"), submits this Memorandum of Law in Support of its Petition to Vacate the Arbitration Award rendered September 22, 2015 ("the Award"; Wanchoo Aff. Ex. 1).  For the reasons set forth below, the Petition should be granted and the Award vacated.

### Statement of Facts

**A.**    **Background Facts[1]**

      On December 15, 2011, ICC fixed the Clipper Karina ("Vessel"), from Nordic Tankers Trading A/S ("Nordic"), as Owner, under an amended ASBATANKVOY Charter Party for the carriage of minimum 10,000 MT of Paraxylene to be loaded at Beaumont, Texas for discharge at one safe port/berth in Korea, Taiwan or PRC (Award,

---

[1] As found by the Majority and Dissent.

pp. 1-2).  The agreed laydays were December 28/31, 2011 (12.00 hours); the freight rate

was set at $95.00 per MT basis one to one with an option to discharge at one or two ports

for Korea and the PRC at $100.00 (*Id.* at p. 2).  The Charter Party also provided for a

premium of a lumpsum of $10,000 for speedy arrival at the loadport (*Id.*).  The brokers in

the fixture were SSY Chemicals ("SSY") and a commission of 2.5% was payable on

freight/deadfreight/demurrage; a 2.5% address commission was due to  ICC on

freight/deadfreight/demurrage (*Id.*).

The Vessel was chartered by  ICC on December 15, 2011 to load a cargo of

Paraxylene that  ICC had purchased from ExxonMobil (Dissent, p. 2).  The Vessel was

fixed with agreed laydays/cancelling of December 28-31 (12:00 hours), 2011 (*Id.*).  The

Vessel was originally expected, and had agreed, to present at Beaumont, Texas by

December 31 at noon with its tanks ready to load (*Id.*).   ICC committed itself to pay an

additional "bonus" of $10,000 to Nordic as a means of encouraging it to present its

Vessel as early as possible (*Id.*).[2]

The Charter Party between the Parties provided , *inter alia*:

18.    CLEANING

The Owner shall clean the tanks, pipes, and pumps of the Vessel to the
satisfaction of the Charterer's Inspector.  The Vessel shall not be responsible for
any admixture if more than one quality of oil is shipped, nor for leakage,
contamination or deterioration in quality of the cargo unless the admixture,
leakage, contamination, or deterioration results from (a) unseaworthiness existing
at the time of loading or at the inception of the voyage which was discoverable by
the exercise of due diligence; or (b) error or fault of the servants of the Owner in
the loading, care or discharge of the cargo.

(Award, p. 14).

---

[2] The Dissent notes that, while the Majority did not believe that time was of the essence to ICC, the Dissent
noted that "Charterers do not readily offer to pay an extra $10,000 to a vessel "for speedy arrival at
loadport" (Dissent, p. 2, n. 1).

Clause 41, the Cleaning Clause, provided:

Vessel to arrive at load port with all cargo tanks, pumps, and pipes suitably clean to Charterer's Inspector's satisfaction in accordance with Clause 18 of this Charter Party, and, further, Owner to ensure that all traces of sediment, tank washing or chemicals, if used, are removed from tanks, pumps, and pipes intended for carriage of designated cargo.  Any delays as a result of Vessel arriving at load port and not being in a suitable condition to load the designated cargo, to be Owner's account, and time not to count.

(*Id*.).

Clause 48 of the Charter Party, Force Majeure, provided:

The second sentence of the "General Exceptions" clause (Part II, Clause 19) shall be amended as follows:

Neither Party shall be liable for damages or otherwise to the extent that its ability to fulfill any provision of this Charter Party is delayed, hindered or prevented by, without limitation, act of God, fire, explosion, storm, flood, war (declared or undeclared), rebellion, revolution, invasion, hostilities, martial law, riot, labor disputes of any kind, strike, lockout, or injunction (whether or not such labor dispute is in the reasonable control of such party), perils of the sea or accident of navigation, compliance with any law, regulations or order imposed by any state or local authorities, breakdown of any plant of Charterer's customers or suppliers, shutdown of any plant of Charterer's shippers or receivers caused by government action or inability to obtain fuel, power or raw materials, breakdown of loading or receiving facilities, embargoes or other import or export restrictions, closing of canals or rivers, blockage of canals, rivers, ports of waterways, any event, matter or thing wherever occurring and whether or not of the same class or kind as set forth above by which by the exercise of due diligence the party concerned is unable to overcome, whether or not such occurrence is reasonable foreseeable.

(*Id*. at pp. 14-15).

Clause 72, Last Cargoes, provided:

Last three (3) cargoes to be suitable for the carriage of this product.  Vessel to supply suitable coated or stainless steel tanks for carriage of this product.

(*Id*. at p. 15).

On December 20, 2011 at 14.22 hours, SSY advised ICC that Nordic was asking for wall-wash specifications and N2 requirements, indicating that the Vessel would be load-ready on December 30 (*Id*. at p. 5).  The following day,  ICC gave instructions to SGS, copied to Exxon, that it was to issue a Cleanliness Certificate before loading, "certifying that the inspected tanks and line system at accessible points only at time and place of inspection are clean and suitable to carry designated cargo" (*Id*.).  ICC provided SGS with its survey instructions for loading Paraxylene, containing the following wall-wash requirements:

APPEARANCE-VISUAL-PASS-CLEAR AND FREE OF SUSPENDED MATTER

HYDROCARBOS-125 PASS OR FAIL PPM MAX CHLORIDE-5PPM MAX

(*Id*.).

ICC also listed the last three (3) cargoes as (1) Lube Oil; (2) Gas Oil and Naptha; and (3) Naptha and Jet Fuel (*Id*.).  ICC further specified Exxon's quality specifications for the Paraxylene (*Id*. at p. 6).  The Certificate of Quality was to contain the test results as per Exxon specifications of sample drawn from each shore tank at loading port:

Quality:        PARAXYLENE Min. 99.7 & Purity as per following specifications:

APPEARANCE, Clear & Free, ASTM D-4176 Mod or Visual COLOR, PT-CO-10 Max. ASTM D-1209 Mod or ASTM D-5386 Mod SULFAR, wppm, 1.0 Max, ASTM D-4045 Mod or ASTM D-6313 Mod or ASTM D-5453 Mod
ORGANIC CHLORIDES wppm, 5.0 Max, ASTM D-5808 Mod
COMPONENT Content [ASTM D-3798 Mod or ASTM D-5917 Mod]
Paraxylene wt%, 99.7 Min.
Orthoxylene wt%, 0.10 Max.
Metaxylene wt%, 0.20 Max.

> Ethylbenzene wt %, 0.30 Max.
> Non-Aromatics wt% 0.20 Max.
> Toluene wt%, 0.10 Max.
> Benzene, wtppm, 10 Max.
>
> Sample Report certifying Sampling from Shore Tank(s) and that such bottles are placed onboard the Vessel.  Receipt for Samples to be obtained.
>
> Time Sheet showing all details of loading operation of the Vessel related to the Ullage report.

(*Id*. at p. 6).

The Vessel was running late (Dissent, p. 3).  On December 28, Nordic requested that ICC agree to extend the laydays to January 5, 2012 at noon local time (*Id*.).  SSY advised ICC that Owner was requesting an extension of laydays until January 5, 2012, at noon local time because the Houston-Westway was occupied to December 31, the Vessel would not be able to berth in Westway until January 1, and would require 36 to 48 hours of tank cleaning en route to Beaumont (Award, p. 6).  The balance of the tanks would be cleaned at an anchorage in Beaumont, expected to be load-ready between January 3 and January 4 (*Id*.).

The delay created a problem between ICC and Exxon, as a consequence of which Exxon suffered a year-end inventory tax issue when it had expected to load the Vessel before December 31, 2011 (Dissent, p. 3).  ICC was thereupon forced to reimburse Exxon for its unexpected tax liability by agreeing to pay a higher price for the cargo; in order to obtain Exxon's approval for the revised later cancelling date, ICC paid it an additional $264,000 (*Id*.).  The Majority described this "anticipated delay" resulting in ICC "offering to" Exxon to pay for the cargo on the basis of 30 days from December 31, 2011 (*Id*. at p. 7).  Mark Myers ("Myers"), Exxon's commercial manager, replied that the

laycan was outside the commercial terms agreed between ICC and Exxon and that this was the second cargo in two months for which ICC had not met "mutually agreed [to] timing" (*Id*.).  Myers asked ICC's Chiragh Sareen ("Sareen") to call him, stating, "this has become a serious issue," and explaining that he had been put in a position of justifying why Exxon should continue doing business with ICC for basic chemicals (*Id*.).  He asked what ICC was willing to offer Exxon for the lifting delay, relating that the minimum expected would be compensation for inventory taxes that Exxon would incur due to the delays (*Id*.).  The Majority found that Sareen agreed to compensate Exxon for the inventory tax that was to be incurred January 1, 2012, at 2% as an average for inventory taxes (*Id*.).  Exxon agreed to extend loading dates to January 4, 2012 (*Id*. at p. 8).

On December 30 at 11.48, SSY confirmed that the Charter was amended to extend the cancelling date to January 4, 2012, and the freight rate was reduced to USD 90.00 per metric ton basis 1:1 and USC 95.00 per metric ton basis 2:2 (Korea a/o China only)(*Id*.).

The Vessel failed to arrive on December 31 or January 5, 2012 (Dissent, p. 3).  On January 2, 2012, at 5:04 pm, SSY advised that Owner was now giving load-ready ETA at Beaumont of January 5 at noon (Award, p. 8).  Sareen answered that it was a "disaster" and wondered how to convince Exxon (*Id*.).  On January 3, 2012, Sareen asked whether Owner needed a superintendent to ensure that the cleaning would be accomplished on time; SSY reported that Owner had advised that basis about 30 hours of cleaning time, followed by drying time, the Vessel would only be load-ready at the Beaumont inner anchorage at 06.00 on January 6 (*Id*.).  Wall-wash and inspection would

be conducted at the inner anchorage at that time, as the terminal did not allow this to be done at the berth (*Id.*).  Agents confirmed that the terminal had received load orders and, in a phone call with SSY, Sareen granted an extension to January 5, 2012 (*Id.*).  At Nordic's request,  ICC was again forced to ask Exxon to extend the cancelling date to January 7 (Dissent, p. 3).  While the Majority characterized the delays as ICC "induced," the Dissent marveled that such was to "blame the victim!" (*Id.* at n. 3).  The Vessel finally arrived at the inner anchorage at Beaumont on January 6 at 12:36 (*Id.*).

On January 6 at 11:40, SSG Inspector Walker advised that he was catching a launch at 13.00 to go to the anchorage to wall-wash the Vessel, after which it would proceed to the dock for loading and that he would be on the Vessel that night (*Id.* at p. 9). ICC told SSY to make sure that the Vessel loaded the maximum quantity of approximately 10,279 metric tons basis specific gravity (sg) of 0.84 (*Id.*).

On January 6 at 17.36, SSY advised Nordic that it had been granted an additional extension of laydays to 16.00 Houston time, which would allow cancelling until 16.00 Houston time on January 7 in the event the Vessel's tanks were not accepted (*Id.* at p. 9).

The Vessel arrived at Beaumont's inner anchorage on January 6 at 12.36 pm, and the Exxon terminal advised that it was ready to load once the tanks had been accepted (*Id.*).  An SGS field surveyor boarded at 13.30, completed a wall-wash test, and departed at 16.00 (*Id.*). A bunker barge arrived at 13.40, its hose connected at 15.05, and bunkering completed at 20.24 (*Id.*).

The Vessel failed pre-inspection at 18:15 due to appearance (off-color) and the presence of hydrocarbons in three tanks (Dissent, p. 3). SGS surveyor Johnson found that in all three (3) tanks (4S, 5S, Slop S), "the color was yellow, the hydrocarbon test had

foam on top; Tanks 4S and 5S barely passed the chloride test" (*Id*.). Upon request of the

Master, the SGS surveyor again returned to the anchorage, boarded the Vessel, and

ultimately passed the three tanks in question at 22:50 (Dissent, p. 4).  The Vessel re-

tendered its Notice of Readiness at 22:55; it had previously tendered  NOR at 5:30 (*Id*. at

n. 6).

The Tank Cleanliness Inspection document, signed by the Vessel, signed by SGS

Field Inspector Jim Tamblyn ("Tamblyn"), was conditional and labeled a "Pre-

Inspection" (Dissent, p. 4).  It stated that the inspection was a "visual check for residues

from Decklevel" and "Tank(s) subject to a final inspection at loading berth in case of Pre-

Inspection" (*Id*.).  The Dissent agreed with the Majority "that SGS was doing Exxon's

bidding to speed up the loading" of the Vessel; but opined that, "in order to accommodate

Exxon, SGS let the vessel proceed to the berth while it was not really clean – as was

subsequently discovered" (Dissent, p. 4, n. 7).  This was a document that cleared the

vessel sufficiency to allow it to proceed to the Exxon Terminal at 5:30 on January 7 and

tender its Notice of Readiness to load the Paraxylene cargo (Dissent, p. 4).

Paraxylene is a light aromatic hydrocarbon produced from the refining of crude

oil (Dissent, p. 4).  It is a highly-refined, fine chemical and is the building block for the

entire polyester industry (*Id*.).  The absence of color is particularly important as the

finished polyester fibers must be "water white" color prior to drying and spinning into

thread (*Id*.).  Exxon's Beaumont Chemical Plant produces the Paraxylene through a

crystallization recovery process and then passes it through a centrifuge (*Id*.).  The

Paraxylene is then transferred to a "prover" tank, used to make sure that the product

meets specifications; only after this step is it then transferred directly to the storage tank

(in a closed system) for loading onto a vessel or barge (*Id*. at p. 5).  It is a self-contained process within the refinery, assuring that the product is delivered to the terminal manifold with no cross-contamination (*Id*.).  Dedicated lines from the refinery to the terminal dock manifold are designed to maintain product purity (*Id*.).  Tank 9608, from which a one-foot sample of Paraxylene was loaded onto the vessel, is segregated, static tank, free from contamination by any other products.  The Paraxylene purchased by ICC was to have 99.7% purity and was to be very clear, of Platinum color of less than 10 (*Id*.).  For this reason, it was vital to ICC and Exxon that the vessel that would load the Paraxylene should have clean tanks (*Id*.).

At the loading berth, a first-foot sample of the Paraxylene was loaded into the vessel's smallest tank (3S) at 0940 on January 7 (*Id*.).  The SGS Field Inspector had taken a running line sample from shore tank 9608, and brought that running line sample as well as the first-foot sample to the Exxon lab for analysis (*Id*.).  Anthony Walker ("Walker"), who was  the SGS Operations Coordinator, was advised on January 7 at 10:40 that the first-foot sample had failed for being "off color" (*Id*.).  Chief Mate Pawlik testified that, when the SGS inspector initially looked at the first-foot sample, he stated it was yellow (*Id*.).  The lab analysis of the sample confirmed this finding (*Id*.).  The Vessel was ordered back to the anchorage to properly clean (*Id*.).

Between January 7 and 9, the Vessel lay at anchorage, cleaning (Dissent, p. 5).  By 21:00 on January 9, cleaning was once again completed (*Id*.).  SGS issued a form entitled "Information for Cleanliness Inspection" wherein it stated that "on the basis of consultation with the vessel's staff," the apparent condition of the tanks was deemed "acceptable" (*Id*. at p. 6). SGS Field Inspectors Jim Tamblyn and Jessie Torres issued a

Tank Cleanliness Inspection document on January 10 (*Id*.).  As a result, he re-tendered the Notice of Readiness at 0006 hours on January 10, 2012 (*Id*.).

The Majority found that SGS considered it possible to add further quantities of Paraxylene into Tank 3S to dilute whatever had created the off-color result (Award, p. 10); and that this was also "considered in the expert testimony as a possible remedy" (*Id*.).  Exxon, the Majority noted, refused to blend the 200 barrels in 3S (*Id*.).  On January 10, wall-wash samples were analyzed at the SGS lab indicating that all cargo tanks failed the appearance test due to of-color (*Id*.).  Excluding cargo Tanks 2P and 3S, the remaining tanks also failed the hydrocarbon test (*Id*.).  Walker advised ICC that, according to SGS information, the samples had a yellow tint, and asked for ICC's intention (*Id*.).  There was suspicion that the prior cargo (Lube Oil) had been absorbed into the tanks' liner/coating (*Id*. at p. 10).

The three (3) tanks that had earlier failed inspection on January 6 were failed again (Dissent, p. 6).  Six other tanks (1 Port (P), 1 Starboard (S); 3P; 3S; 4P; and 5P also failed the January 10 inspection due to a yellowish color and presence of hydrocarbons (*Id*.).  Two other tanks (2P, 2S) failed for color, but were able to pass the hydrocarbon test (*Id*. at pp. 6-7).

SGS Inspectors returned on board at 20:54 on January 10 and administered a second wall wash test (*Id*. at p. 7).  The tanks again failed (*Id*.).  Nordic called its P&I club for further investigation and retained Caleb Brett/Intertek to independently inspect the tanks (Award, p. 10). The latter conducted wall washes on the Vessel's tanks on January 11 at 11:40 (Dissent, p. 7).  Intertek found that all tanks failed the appearance test, had particles in them, and failed the test for hydrocarbons, water miscibility of

water-soluble solvents, and were found to have more chlorides than allowed (*Id.*).  Tanks that had never loaded any Paraxylene repeatedly failed inspection (*Id.*).

On January 11 at 07.24, Exxon's Jonathan Lee advised Sareen that Exxon was reaching containment and the next ship scheduled was also an ICC lifting on the SIVA MUMBAI (Award, p. 11).  He asked whether there were any clean tanks on the Vessel because Exxon needed to get some barrels out by the 14th (*Id.*).  Sareen replied that there were three barges that could load 3,950 MT on the 14th and that he was waiting for one more that could load 1,250 MT (*Id.*).

On the same date, Sareen was advised that Caleb Brett/Intertek had also failed all the tanks on appearance and particulate contamination, water miscibility and chlorides (*Id.*).  On January 13, SGS returned and took wall-wash samples from Cargo Tanks 5P and 5S which again failed for color (*Id.* at p. 12).

On January 13, SSY transmitted the following message to ICC on behalf of Nordic:

> We have unfortunately just been advised via our agents in Beaumont that the new set of samples failed again.  They advised that when the samples reached SGS's lab and the samples failed on color and that hydrocarbons and chlorides were not tested.
>
> As the Vessel have [sic] performed three extended tank cleanings, and each time failed tank inspections, we have exceeded all options, and further tank cleaning is obsolete, wherefore we urgently ask Charterers ICC to immediately cancel this charter party without prejudice to either party.  The 36 tons off-spec Paraxylene on board will have to be discharged into trucks at ExxonMobil terminal . . . .

(*Id.*).

ICC responded that it would suffer huge financial losses should Nordic fail to perform its obligations under the Charter, "as goods have already been sold[,] and shall hold owners responsible for damages under Clause 49 of the C/P," stating:

> Our supplier, Exxon, has put us on notice (for which we put Owners on notice) holding ICC responsible for failure to lift the PX on time, and as they have containment problem, they will shut down PX production if the current inventory is not shipped out under the terms of the C/P.

(*Id.* at p. 12).

> On January 14, SSY transmitted an email from Owner:

> Further to our message yesterday requesting Charterers to cancel this Charter Party, the Vessel has once again cleaned cargo tanks, and taken methanol wall-wash samples which, as per enclosed photo shows, clearly continue to be yellowish, once again pro[v]ing our earlier statement that further cleaning is obsolete and will not improve the cleanliness of the cargo tanks any further, wherefore Owners insist that Charterers ICC latest by tomorrow 15 noon NYC cancel the charter party in order to mitigate costs.

(*Id.* at p. 13).

On January 16, Sareen advised SSY that ICC cancelled the Charter Party while "reserv[ing] its rights" thereunder to claim all proven damages/losses/costs (*Id.*).

Between January 13 and February 6, 2012, ICC arranged for the loading of the Paraxylene into six barges (*Id.*).  On February 5 and 6, 2012, about 4,800 MT of Paraxylene was transshipped from barges 245, 158, 156, and 269 to the SIVA MUMBAI (*Id.*).

### B.    Parties' Contentions

ICC argued that Nordic breached the Charter Party by failing to present clean tanks in accord with Clauses 18 and 41 (Award, p. 15).  It also alleged that the Parties agreed that the laycan was to be December 28/31, 2011, and that Owner undisputedly missed it, thus breaching the Charter (*Id.*).  ICC stated that it had no choice but to agree to a 2% increase on its purchase price under its contract with Exxon (*Id.*).  Nordic also breached the Charter by failing to present clean tanks for several days and was ultimately unable to load (*Id.*).  ICC claimed that it was entitled to an award of damages for the

actual expenses or losses reasonably incurred which it, as the innocent party, incurred in mitigation of its ultimate loss (*Id*. at pp. 15-16).

Nordic denied that it breached the contract and argued that ICC's claim for delay was frivolous because the Vessel met its extended laycan dates (*Id*. at p. 16).  It argued that ICC's remedy for an alleged failure to meet laycan was cancellation of the Charter without a right to damages in most cases (*Id*.). It argued that ICC's position that it wrongfully cancelled the Charter was inaccurate (*Id*.).

### C.    Award and Dissent

### A.    Majority Award

In the Majority decision, penned curiously in the first person ("I will focus on certain distinct but related issues, which, in my view, impact the decisions") (Award, p. 18), the Panel first looked at the Exxon/ICC contract, calling for delivery dates of December 20-25, 2011 (*Id*. at pp. 18-19).  The Majority pointed out the following other points about that contract:

- It was an FOB transaction ex Seller's berth and did not specify a performing vessel or barge;
- It appears that ICC initially nominated the vessel CAVATINA (EM Order 3450799) with a cargo loading date of December 20;
- The Vessel did not perform, and Exxon, at the request of ICC, cancelled the nomination;
- The CAVATINA's EM order number was assigned to the Clipper;
- On December 28, ICC requested that Exxon grant an extension of laycan to noon on January 5 (with an ETA of January 3-4) because the Vessel experienced unforeseen delays;
- ICC offered to pay Exxon for the cargo at the original terms;
- Exxon stated their desire to have the lifting by December 31, to which ICC responded that the Vessel had to discharge first before loading the cargo (*Id*. at p. 19);
- On December 28, Exxon responded that the laycan was outside the commercial terms agreed between ICC and ExxonMobil and asking what ICC was willing to offer to compensate EMCC for the lifting delay (*Id*. at pp. 19-20).

- ICC replied that the Vessel arrived in Houston on schedule but Shell's jetty at Westway was congested and had ullage issues; and that the delay was due to matters totally unrelated to ICC (*Id*. at p. 20);
- On December 29, ICC wrote that the Vessel had a laycan of December 31 to 31; on the 27th, she arrived at Houston fully ready to discharge for Shell, which had problems with its ullage and could not berth until December 31;
- ICC was advised of the fact by Nordic the day before and immediately notified Exxon;
- ICC tried that day to locate barges to start loading (*Id*.); if all else fails, ICC agreed to increase the FOB price by 2% and accept title and transfer tank as of December 30, 2011 and pay for the cargo on the 30th day from BL instead of using BL date as transfer date (*Id*. at p. 21).
- On December 30, Exxon confirmed that it was acceptable to the price change if the cargo slipped to 2012 (*Id*.)

The Majority interpreted the last message from Exxon to mean that, if the cargo slipped into 2012, it would accept the increase price proposed by ICC and discussions would be held between Exxon and ICC to work out the extension of cancelling date to January 5, 2012 (*Id*. at p. 21). It continued:

- On December 30, Exxon acceded to a cancelling date extension since SSY confirmed to ICC the agreement reached with Nordic that the cancelling date had been extended to January 4, 2012, with a freight reduction of $5.00 per mt (*Id*.).
- In ICC's Pre-Hearing Brief, counsel stated, "Finally, laydays were extended until 16.00 January 5" (*Id*. at p. 22).

The Majority dubbed the "time of the essence argument advanced by ICC" a "red herring" (*Id*.). According to it, the facts showed that the laycan problem was ICC's own doing because "the terms of the Exxon/ICC contract were in conflict with the charter party for the Vessel; and ICC agreed to make payments to Exxon to induce it to agree to the January cancelling date (*Id*.).

The Dissent responds directly to the characterization of the evidence, noting that, in the Dissenting Arbitrator's experience, "Charterers do not readily offer to pay an extra $10,000 to the vessel for speedy arrival at loadport. The vessel's itinerary was

14

represented to Charterer as being loadready at Beaumont on December 30, 2011"
(Dissent p. 2, n. 1).

The Majority found that ICC's argument "that the root cause of this cancellation
lies with the Owner is certainly not supported by any of the undisputed facts" (Award, p.
22). Again writing in the first person, the Majority finds "the non-performance of the
CAVATINA up to the fact that, in my opinion, under no circumstances and based upon
the underlying contracts, legitimate December 31, 2011 Bills of Lading could" not have
issued (*Id*.). If the Vessel had arrived in a loadready condition at Beaumont on December
31, before noon, she would have been in compliance with the ICC Charter Party laycan
(*Id*.). The Vessel could have tendered a valid NOR and proceeded directly to berth #2
(*Id*.). The Majority concludes that, even if the loading rate had been doubled, the
completion of loading would still have been in 2012 (*Id*. at p. 23). "Ergo, this time of the
essence issue was ICC's self-created problem" and the $10,000 speedy arrival proposal
"was a bonus, a voluntary offer, but not a condition of contract" (*Id*.).

As to the ICC/Nordic fixture, the Majority found the following:

- The fixture was concluded December 15, 2011;
- The laycan were for December 28-31, 2011;
- The coating was identified as "Sigma Phenolic Expoxy"[3]
- The last three cargos were Lube Oil, Gas Oil/Naptha and Naptha/Jet Fuel;
- The vessel's itinerary was ETA Houston (discharge) December 26 – ETS
  Houston December 28 (tank cleaning) – ETA Beaumont (loadready)
  December 30 (*Id*. at p. 23);
- On December 30, SSY confirmed that ICC extended the laycan to January
  4, 2012 against $5.00 per ton freight reduction;
- On December 20, SSY relayed to ICC an update to the Owner on vessel's
  position; i.e., arrival Houston December 27 morning for discharge, then
  tank cleaning with a loadready of December 30; the schedule was

---

[3] The Majority noted that ICC accepted the description of the coating presented, noting that the vessel cited in the fixture exchanges and relied upon for "all other terms as per . . ." had stainless steel tanks (Maemi November 14, 2011 – CLIPPER OCEANICA May 17, 2011 – HARBOUR CLEAR November 4, 2010 and July 14, 2010)(Award, p. 23, n. 29).

qualified with "all going well, weather permitting, subject rotation and
berth availability; in the message, Nordic also requested information on
wall-wash specifications, if any (*Id.* at p. 24);

• The fixture contained ICC's Rider Clause 41 and the ASBATANKVOY
form Clause 28; after Nordic's December 20 inquiry about wall-wash
requirements, ICC asked SGS what the "w/w parameters" were, which
Walker then supplied and ICC passed on to the Owner (*Id.*).

The Majority noted that it has not been argued that Nordic was an inexperienced

Owner/Operator of chemical tankers (*Id.* at p. 25); but ICC had a pre- and post-CLIPPER

KARINA shipping relationship with Nordic (*Id.*).  "The fact that the Owner raised the

question regarding wall-wash procedures/standards required, supports Nordic's

professional approach, . . . ." (*Id.*).  The Majority found that the "record clearly show[ed]

that the Owner made every possible effort to present a clean and suitable vessel"; and that

the Vessel passed the wall-wash test on January 6 and was accepted for loading (*Id.*).

In response to this, the Dissent dubbed the case one "in which a vessel was never

clean enough to be able to load its intended cargo" (Dissent, p. 1).  The Vessel "owner

ultimately recognized that the vessel could not be cleaned and asked Charterer to relieve

it of its obligations to perform, which ICC did while reserving all its rights" (*Id.*).  The

Majority "has inexplicably decided to disregard Owner's clear breach of the Charter

Party" (*Id.*). The Dissent continued:

Throughout the majority decision, my distinguished colleagues have done their
utmost to avoid criticizing the vessel owner for either the late arrival of the ship
or for [its] failure to clean [the] tanks to a level acceptable to load the intended
cargo.  They have ignored Charterer's attempts to mitigate and have denied any
recompense to Charterer for the expenses it incurred due to the actions of the
ship.  Instead of considering the actual claim asserted by ICC under the Charter
Party against the vessel owner, the panel majority has ignored evidence of the
ship's failure to provide clean tanks.  They have decided to deflect attention
away from the evidence, focusing instead on a vessel which had been previously
nominated by ICC, on the quality of the cargo Exxon was ready to load, and on
the terms of the commodity sales contract between Exxon and ICC, alternatively
laying blame on SGS, the inspection service which was hired by ICC . . .

(*Id.* at p. 2).

The Majority found that "vessel do fail on their first or even second wall-wash test"; and that it is "not unheard of that vessels fails their first one-foot sample test" (Award, p. 25).  It indeed found that "each event appeared to be magnified by the ICC/Exxon relationship, caused in part by the ICC-induced delay of the vessel and Exxon's 2011 shipping date requirement" (*Id.*).  It found that "ICC insisted on continued cleaning and testing" (*Id.* at p. 26).

With regard to the Cleaning Clauses of the Charter Party, the Majority found that the clauses had in common that the state of cleanliness of Vessel's tanks, pipes, and pumps must be to the satisfaction of Charterer's inspector (*Id.*).

The Majority pointed to a "number of court and arbitration decisions . . . cited by the Owner addressing the performance and compliance of tank inspectors with applicable contract clauses" (*Id.* at p. 28).  It looked to BRAGE VIBEKE, and wrote that SGS failed to perform required tests and issue written reports on them, in "a dereliction of duty" (*Id.*).  The Majority also noted that "SGS did not cooperate, but rather belatedly complied with documentary submissions" (*Id.*).  It looked to the Engagement Letter in which SGS agreed to provide ICC and Exxon with, *inter alia*, cleanliness certificate before certifying that the inspected tanks and line system were suitable to carry the cargo; certificate of quantity by shore tank measure taken before and after loading; certificate of quality containing the test results as per Exxon specification (*Id.* at p. 29); and sample reports certifying sampling from shore tanks and that such bottles are placed on board the vessel (*Id.* at p. 30).

The Majority found that "it was admitted through the Walker deposition [sic] by ICC that SGS did not conduct a test of tank 9608's quality at all on January 7, 2012 (*Id*.). It showed the cargo quantity in tank 9608 and the tank quantity after loading the first-foot sample (*Id*.). The Majority found "interesting" that the first foot sample was only .0018% of the tank's total contents (*Id*. at pp. 30-31). "There is no evidence from where the cargo left the tank and entered the shore line (*Id*. at p. 31); the Exxon January 5 sampling did not explain how the quality sample was taken; and it is common industry knowledge that shore tank samples are taken at different levels (*Id*.). Asked the Majority:

> If one does not have a definite starting point, how can one advocate or accept that the Paraxylene cargo supplied by Exxon for the first-foot sample was in total compliance with the Exxon standards and specifications when it reached the Vessel's manifold?

(*Id*.).

The Majority then questioned how a running sample could "be taken 15 minutes after the pumping had stopped" (*Id*. at p. 31). Later, it asks how a running sample could be taken at 08.00 when the tank only became live at 08.35 (*Id*. at p. 32). It faulted SGS for failing to mention whether they were top, middle or bottom samples (*Id*.). Later still, the Majority questions why SGS did not exercise its contractual duty to perform the tests and instead left it in the hands of an interested party, the cargo supplier (*Id*.). It asked why single sets of samples were taken contrary to ICC's instructions, which stated that the vessel should receive sample reports clarifying sampling from shore tanks and that such bottles be placed on board the vessel (*Id*.). "How is it possible that, in the mass of paper, there are no copies of the crucial sample receipts and test results?" (*Id*.). "In a business which relies on accuracy of quantity and quality, the files of SGS . . . were incomplete, on occasion incorrect and, in the case of Mr. Walker, mostly hearsay" (*Id*.).

The Majority further faulted the practices of SGS, dubbing its "production in this arbitration . . . not helpful to clarify matters;" and its "reluctance to come forward with full disclosure for its client" troubling (*Id* at p. 33).  "The SGS contribution to ICC's case is reminiscent of "who's on first, what's on second" (*Id*. at p. 34).  The Majority found the documents produced "unacceptable" (*Id*.).  The Majority further found that a "true shore line sample would have established the cargo's condition before it crossed the ship's rail" (*Id*).

The Majority focused on colloquy between the Panel and ICC's counsel in which the undersigned indicated that SGS had taken samples and the results of the analysis would be produced (*Id*. at p. 37).  It concluded that, here,

> we had an Owner who wanted to carry the cargo and spent substantial time at Charterer's disposal to fulfill his contractual obligation; we had a Charterer who certainly was committed to supply a cargo, but unfortunately was dealing with an inflexible and a less than straightforward and compliant contractor who obviously felt greater loyalty to Exxon than ICC.

(*Id*. at pp. 37-38).

While giving reference to the expert opinions in the case, the Majority simply noted that it had "certainly read them, carefully considered them in [its] deliberations and given them the weight that they deserved" (*Id*. at p. 38).

At core, the Majority found it "a burden of proof case in which ICC needed to show that the cargo supplied by Exxon, supported by an SGS shore line sample analysis, was on specification" (*Id*.).  ICC could not do so because proper shore line sampling could not and was not done (*Id*.).

The Majority looked to a 1993 decision in which simultaneous foot samples were loaded into three designated tanks to be analyzed before completing loading of the full

shipment (*Id.* at p. 39).  There, the most "overwhelming evidence" was that the glycerine

foot sample was loaded simultaneously into the vessel's three tanks through one common

line from the shore tank but only the product in 10SA was contaminated (*Id.*).

The Majority concluded that, had ICC considered taking multiple one-foot

samples to establish the Vessel's inability to carry the cargo, the expenses incurred would

have been substantially less (*Id.*).  It faulted ICC for failing to enact "proactive options in

mitigation of the potential direct claims under the ICC/Nordic contract," ceding "its

responsibilities to Exxon, the party which had nothing to lose but everything to gain"

(*Id.*).  The Majority looked to the doctrine of mitigation, citing VOYAGE CHARTERS

(*Id.*).

"As to the balance of the arguments made by the parties," the Majority wrote that

any point argued but not specifically addressed in the decision was summarily dismissed

sub silentio (*Id.* at p. 40).

The Award denied recovery to either side, and denied claims for cost and

reimbursement of legal fees for both parties (*Id.*).

### B.     Dissent

The Dissent noted that tanks "which had never loaded any Paraxylene repeatedly

failed inspection"; but the Majority blamed "the Paraxylene which had never been loaded

into any of the tanks for the failure of those tanks to pass the cleanliness test" (Dissent, p.

7).  The Majority was not interested in what happened after January 7, 2012; "willfully

refus[ing] to acknowledge the truth: that the vessel was not suitably clean to Charterer's

Inspector's satisfaction" as required by Clauses 18 and 41 of the Charter Party (*Id.*).  "It

is only interested in ruling that the vessel had satisfied Charterer's surveyor, SGS and was ready to load" (*Id.*).

The late arrival of the Vessel and the issue of seeking extensions to January 7, on which the majority decision concentrates, reflects just a portion of ICC's damage claims (*Id.*).  The most substantial damages incurred by ICC resulted from the fact that the Vessel was never able to sufficiently clean its tanks to the satisfaction of any surveyor, whether SGS or Intertek (*Id.* at pp. 7-8).

The Dissent further noted that, instead of considering Charterer's claim for the substantial expenses it incurred after the vessel repeatedly failed inspection, the Majority "deliberately ignored them and instead focused on the commodity sales contract between Exxon and ICC" (*Id.* at p. 8).  In doing so, the Majority focused on a "red herring": the intended cargo that Exxon was ready to load on the vessel (*Id.*).  Normally, when a claim arises involving the quality or condition of a product, a buyer (ICC) makes a claim against the FOB Seller (Exxon) under the terms of the sales contract (*Id.*).  ICC did not do so (*Id.*).  Due to its long relationship with Exxon, "ICC was obviously satisfied with the quality and condition of the Paraxylene available for loading on this vessel, for its account" (*Id.*).

> . . . . The evident reluctance of my colleagues to attribute any fault to the vessel owner has led them, with no presentation of sustaining evidence whatsoever, to uphold unfounded allegations made by the vessel owner about the quality of the Paraxylene to be loaded.  This is simply a pretext which allows the majority to elide the otherwise inescapable finding that Nordic breached the Charter Party by not presenting a vessel with clean tanks to load ICC's cargo.

(*Id.*).

The Dissent further faulted the Majority's refusal to look at the "overwhelming evidence presented in this arbitration regarding the cleanliness of the vessel's tanks and

21

Charterer's damages" (*Id*.).  It found that ICC carried its burden of proof by providing

"independent evidence that the vessel's tanks were never clean enough to load the cargo

and that it mitigated damages by chartering replacement barges and vessels to ultimately

ship its cargo to its buyers in China" (*Id*. at p. 9).

The Dissent found irony in the Majority's statement that "arbitrators are looking

for the truth" when they themselves refused to acknowledge the truth: that all of the

vessel's tanks had failed inspection on numerous occasions; that Charterer's surveyor;

and even Owner's surveyor did not pass the vessel's tanks and that the vessel could not

load the cargo for which it was chartered (*Id*. at p. 8).  "The vessel could not even offer

one clean tank in which to load the Paraxylene" (*Id*.).

The Dissent also noted that the Master never made a statement insisting that the

Vessel's tanks were clean enough to carry the cargo (*Id*.).  However, the Majority "opted

to attribute these black particles to the Paraxylene itself" (*Id*. at p. 10).  The particles

called into questions were found in all tanks, even those that had no contact with the

Paraxylene (*Id*.).

The Paraxylene purchased by ICC was warranted to have 99.7% purity and was to

be very clear, of Platinum color of less than 10 (*Id*.).  After Exxon had been informed by

ICC that the Vessel was expected to arrive and load on January 5, its laboratory

performed an updated analysis of the sample drawn from Tank 9608 at 08:26 on that date

(*Id*.).  That analysis was presented in evidence, and the product was found to have a

purity of 99.74%; it passed the appearance test and was described as having a Platinum

Cobalt color of 2 (*Id*.).  This evidence was not convincing for the majority because the

first foot was loaded late; and Exxon, not a party to the arbitration, supplied internal

documents regarding samples (*Id.*).  Exxon's Jonathan Nuckolls, Aromatics Supply Planning Supervisor at the Refinery, stated that the shore tank and live units samples met all quality specifications, including the color specification at the time of the January 7 loading (*Id.*).  The declaration was accompanied by a document according to which Tank 9608 was tested on January 7 at 0400 (*Id.* at pp. 10-11).  The sample from Product Tank 9608 on January 7 passed on appearance and had a purity of 99.73 and Platinum Cobalt color of 3 (*Id.* at p. 11).

Exxon also submitted information about the first foot and final samples which had been tested on the Vessel, which loaded immediately prior to the Vessel on December 31, as well as on the barge that loaded immediately after, on January 14 (*Id.*).  All passed for purity, appearance and color (*Id.*).  Nevertheless, such evidence did not prevent the Majority from deciding that the Paraxylene was responsible for causing the contamination of tanks in which it was never loaded (*Id.*).

The Dissent further noted that, instead of "ruling that the vessel owner bore the burden to show that his vessel's tanks were clean to the satisfaction of Charterer's inspectors," the Majority imaged a "conspiracy between Exxon, ICC and SGS" and "decided to shield the vessel from any responsibility in spite of the fact that [its] tanks were coated with phenolic epoxy" (*Id.*).  Chief Mate Pawlik and Nordic expert Guy Johnson admitted that such coatings have a tendency to retain prior cargo residues (*Id.*).

Prior to its arrival at Beaumont, the Vessel had previously carried lube oil SM 500 and SM 150 and gas oil (*Id.* at p. 12).  It underwent cleaning with aggressive/penetrating solvents (*Id.*).  The Chief Mate explained that he consulted Dr. Verwey's manual on tank cleaning and followed recommendations for lube oil without considering the Vessel's

prior cargoes, such as gas oil (*Id*.).  "In any event, the choice of the best cleaning method

is the sole responsibility of the Owner" (*Id*.).  Johnson wrote in his article that the

responsibility for the tank cleaning is always on the Vessel (*Id*.).

   With regard to mitigation of damages, the Dissent found that Nordic breached the

Charter Party by presenting tanks which were not ready to load the product (*Id*.).  "There

can be no doubt that Nordic failed to fulfill its obligation to present a clean vessel" (*Id*.).

While the Majority did not dispute the fact, it suggested that it dealt with the issue "sub

silencio, which means that it refuses to rule on Charterer's legitimate claim.

> The two of the brightest and most highly respected New York maritime
> arbitrators obviously agree sub-silencio that Owner breached its duty
> to present a vessel capable of loading the cargo for which it had been
> chartered.  For some unfathomable reason, the majority does not
> wish to admit that obvious conclusion.

(*Id*. at pp. 12-13).

   The Dissent further found that Nordic wanted ICC to release it from the Charter

Party without paying any damages, which no "charterer can or should agree to . . . under

such circumstances" (*Id*. at p. 13).

> Owner had the honesty and decency to admit that it could not fulfill its duty
> under the Charter Party and to clean the [Vessel] sufficiently enough to allow
> it to load the [cargo].  The majority, however, has chosen to ignore this
> admission and brazenly shields the vessel owner from any further responsibility
> to the Charterer, denying justice to the latter.

(*Id*. at p. 14).

   To mitigate damages caused by Nordic's failure to provide a clean ship, ICC was

forced to find alternate means of carrying the cargo to its ultimate buyers (*Id*.).  American

law provides that, for failure to provide a ship for loading, the measure of damages is the

difference between the cost of the cancelled charter and the actual cost of substitute performance (*Id.*).

> By refusing to rule on Charterer's claim for damages arising from the repeated failures of the vessel to have all tanks pass the required cleanliness tests to load the cargo, the majority has shown its utter disdain for the problems (and additional expense) such a failure has cost the Charterer. The majority has also demonstrated a surprising refusal to follow the law. Instead, my colleagues have condemned the supplier, the quality of the product to be loaded, SGS, and the Charterer.

(*Id.* at p. 15).

The Dissent reasoned that the law applying to maritime contracts requires that the innocent party be put in the same position as he would have been in but for the breach (*Id.*). ICC in this case was "the non-breaching party which incurred expenses to perform the subject of the cancelled Charter Party" (*Id.*).

Despite the Vessel's inability to clean her tanks, ICC still had the obligation to deliver the cargo destined to its Chinese customer (*Id.* at pp. 15-16). To mitigate damages, it hired barges to do so and relieve Exxon of its unexpected inventory containment problem (*Id.* at p. 16). The six barges loaded between January 14 and February 6, 2012 without incident – there "was evidently nothing wrong with the Paraxylene which was supplied from Tank 9608" (*Id.*).

The Dissent ruled that the recoverable damages include the expenses ICC incurred to mitigate damages: loading, carriage, and discharge of the product, as well as other charges, totaling $592,790.10 (*Id.*). Many courts and SMA awards awarded such damages when a vessel failed to present in good order for loading; and ICC incurred $328,606.19 in expenses to barge owners in freight, demurrage, and loading expenses and had to pay to discharge the barges in two vessels (*Id.*). The Dissent found that freight

differential is one of the most customary type of damages incurred by a party when a voyage is not executed (*Id*.).  "Owner, who would have access to such information, never presented any evidence that there was anything wrong with the Paraxylene which the SIVA MUMBAI ultimately delivered" (*Id*. at p. 17).  This was the same product that was to be loaded on the Clipper (*Id*.).

The Dissent found that ICC also suffered damages in cleaning the barges, hiring tankermen, and renting lightering equipment to load (*Id*.).  It also incurred extra surveyor expenses; and, in the transfer process, some Paraxylene was lost (*Id*.).  As a result, it had to pay for a total of 9,992.268 MT of Paraxylene (*Id*.).

Under the law of damages, the Dissent held, ICC was entitled to reimbursement for expenses directly arising from Nordic's breach of the Charter Party (*Id*.).  Nordic would have been credited for any expenses that ICC would have incurred anyway (*Id*.).  "Needless to say, I would have awarded Charterer the majority of its costs in pursuing this arbitration" (*Id*.).

> In its decision, the majority states that SGS shielded Exxon.  In actuality, the majority shielded the vessel owner in this case and, in my opinion, failed to give a fair hearing to both parties.  All the CLIPPER KARINA was required to do in Beaumont under the Charter Party was to pass inspection.  Owner failed to present a vessel that could load ICC's cargo.  Under the law, ICC is entitled to its proven damages.

(*Id*. at p. 18).

## Argument

### Standard Of Review

The Convention on the Enforcement of Foreign Arbitral Awards (the "New York Convention") provides that recognition of an award may be refused on the grounds set forth in Article V, 9 U.S.C. §§ 201 et. seq. and Section 10 of the Federal Arbitration Act

(the "FAA"), 9 U.S.C. § 10, enumerates the exclusive statutory grounds for vacating an

arbitral award. *See Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 584 (2008).

Under the FAA, vacatur is warranted in the following circumstances:

> (1)  where the award was procured by corruption, fraud, or undue means;
>
> (2)  where there was evident partiality or corruption in the arbitration, or either of them;
>
> (3)  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights to any party have been prejudiced; or
>
> (4)  where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. §10(a).

In addition, as "judicial gloss on the[se] specific grounds for vacatur of arbitration

awards," *T.Co. Metals, L.L.C. v. Dempsey Pipe & Supply, Inc.,* 592 F.3d 329, 340 (2d

Cir. 2010), the Second Circuit has "held that the court may set aside an arbitration award

if it was rendered in manifest disregard of the law." *Id.*

A party seeking vacatur for manifest disregard of the law must not only show that

"the governing law alleged to have been ignored by the arbitrators was well defined,

explicit, and clearly applicable," but also that "the arbitrator knew about the existence of

a cleanly governing legal principle but decided to ignore it or pay no attention to it."

*Jack v. Sterling Jewelers, Inc.,* 646 F.3d 113, 121 n. 1 (2d Cir. 2001).

## I.      The Panel Majority Exercised A Manifest Disregard Of The Law.

<u>Law</u>

The objective component to the issue of whether an arbitrator manifestly

disregarded the law is whether the governing law allegedly ignored was well-defined, explicit, and clearly applicable. *Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986). The subjective component of the test looks to the knowledge actually possessed by the arbitrators and requires the movant to demonstrate that the arbitrator was aware of the existence of the clear legal principles and appreciate that it governed the case but decided to ignore it. *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 209 (2d Cir. 2002).

<u>Application</u>

Here, it is respectfully submitted, both the objective and subjective elements of the manifest disregard of the law standard have been met: With specific regard to the relative burden on the Parties to the arbitration, the law is well-drafted, explicit, and clearly applicable.

As set forth in ICC's papers to the Panel, the burden of proof to show due diligence in providing a seaworthy ship is on the owner, due to its superior knowledge of what diligence was used, compared to the shipper, which has none. *GTS Industries S.A. v. S/S "Havtjeld,"* 68 F.3d 1531, 1535 (2d Cir. 1995). (Wanchoo Aff., Ex. 2, p. 14)

> Here, to the contrary, the Majority found it
>
> a burden of proof case in which ICC needed to show that the cargo supplied by Exxon, supported by an SGS shore line sample analysis, was on specification. ICC could not do so because proper shoreline sampling could not and was not done."

(Wanchoo Aff., Ex. 1, Award, p. 38).

The Dissent noted that, instead of "ruling that the vessel owner bore the burden to show that his vessel's tanks were clean to the satisfaction of Charterer's inspectors," the

Majority imagined a "conspiracy between Exxon, ICC and SGS" and "decided to shield the vessel from any responsibility in spite of the fact that [its] tanks were coated with phenolic epoxy" (*Id.*; Dissent, p. 11).

The Dissent faulted the Majority's refusal to look at the "overwhelming evidence presented in this arbitration regarding the cleanliness of the vessel's tanks and Charterer's damages." It found that ICC carried its burden of proof by providing "independent evidence that the vessel's tanks were never clean enough to load the cargo and that it mitigated damages by chartering replacement barges and vessels to ultimately ship its cargo to its buyers in China." (*Id.,* Dissent, p. 8-9).

By erroneously ignoring the applicable burden of proof, the Panel Majority ultimately ruled against ICC, finding that it did not meet its burden of establishing the good order of the cargo. At the same time, it did not explain why the burden was on ICC to establish the condition of the cargo where this was not a contamination case.

In this way, though claiming to give little heed to either expert opinion in this case, the Panel Majority evidently adopted Johnson's, agreeing with him that this was a contamination case. Johnson's report, detailed in ICC's post-hearing main brief (Wanchoo Aff., Ex. 2), wrote extensively about this case being one about contamination, claiming, *inter alia*, that the issue was where the "contamination" in the first foot sample came from. (*Id.* at p. 10-11). Johnson also testified at hearing about the "contamination" of the first foot sample. (*Id.* at p. 11)

In spite of the above, the Panel Majority overlooked that Johnson separately confirmed that he would not expect anybody to try to identify the cause of the discoloration in the first foot sample because it was "not particularly relevant to the case"

(*Id*. at p. 12).  He also testified that he would not have recommended that the nature of any contaminants be analyzed, or determine from where the color was coming from because the job was to "get rid of that color" (*Id*.).

Furthermore, the idea that this was a "contamination" case was not brought up by Nordic until the hearing, and Nordic did not request records going to the product's specifications.   It presented nothing but speculation that the product was off-specification. (*Id.* at p. 12-13).

Most glaringly, at hearing on the record, the Panel voiced acceptance of the position that this was not a contamination case:

> THE CHAIRMAN:   . . . . .
>
> > The next issue in our minds is the parties' respective burdens of proof with respect to the wall wash samples and the one foot loading, and I know there's disagreement between the parties, it's very evident from their witnesses' statements and rebuttal statements and in your briefs, that ICC feels, and their expert feels, that this is not a Carriage of Goods by Sea Contamination case, which we accept.  It's not a COGSA contamination case.  Did I say ICC?  I meant COGSA, it's not a COGSA contamination case. . . .

(Wanchoo Aff., Ex. 4, pp. 624: 13 – 625: 5).

The Majority's Award furthermore states that "the panel is in agreement that this matter is not a COGSA cargo case" (Wanchoo Aff., Ex. 1, Award p. 18).

There is simply a dearth of evidence or reason as to why the Panel Majority chose to not only ignore the relevant burden of proof, but to impose upon ICC a burden that was neither called for nor applied.  As a result, its Award was in manifest disregard of the law.

Nor is the case law to which the Majority cites any more on point.  In SMA Award No. 2957 (1993), cited at the Award on Page 39, the dispute was not failure to present a clean vessel, but "a dispute regarding responsibility for the contamination of a foot sample . . . ."  (Wanchoo Aff., Ex. 5, p. 1). That the Majority would focus on a case in which contamination was in dispute undermines its earlier expression of understanding that this dispute was not a COGSA contamination case.  Indeed, in SMA 2957, the "only dispute . . .  concern[ed] Dow's claim to recover the value of the foot sample . . . and the costs associated with re-handling the contaminated product." (*Id.* at p. 2).  There, Owner responded by referencing COGSA.  "The panel" there agreed "that to make out a prima facie case under COGSA, the claimant need only show by a preponderance of credible evidence that it delivered the cargo in good condition and that it was discharged in a damaged condition." (*Id.).*  Hence, the Award could not be more factually or legally inapposite to the dispute at bar.

In rendering its decision, the Majority also overlooked or flatly ignored the other awards presented in ICC's post-hearing main brief. (Wanchoo Aff., Ex. 2).

For example, in *Yellowfin Shipping Co., Ltd. and Laurin Maritime (America), Inc.,* SMA No. 3959 (2007)(Arnold, Bulow and Nergaard), the owner's position was that after the initial survey of the tanks failed and the SGS surveyor and the crew discussed the cleaning process and the criteria for acceptable parameters, only two such parameters were identified: hydrocarbon (250 ppm) and color (10 max.).  Based on that information, the crew was justified in believing that they were the only analyses that would be done, and that the cleaning efforts should be focused on complying with these two parameters only.

There, the tanks were rejected five times before the cancelling date and the vessel failed the last wall-wash tests.  Whether or not the owner succeeded in cleaning the tanks to a satisfactory degree was "left to the sole discretion and judgment of Charterer's inspector" under the charter party.

The panel unanimously found that, under the circumstances, rejection of the vessel as not read to load the nominated cargo was reasonable:

> . . . . SGS was tasked with approving the Vessel's tanks for a delicate cargo of water-white styrene, and the past five days had certainly demonstrated that the tanks on the Mountain Blossom were far more difficult to clean than the standard or average cleaning job . . . . The commonly used tank cleaning guide by Dr. A. Verwey prescribes only Butterworth washing with warm fresh water for one and two hours, respectively, when cleaning for styrene from UAN and gasoline in a coated tank.  Even with multiple Butterworth washings with water and also the flushing with methanol and other cleaning chemicals for several hours, all tanks still did not pass the basic criteria for hydrocarbons and color. . . .

The panel further noted that, when it rejected the charterer's motion for summary dismissal of the case, it was primarily on the basis of the owner's argument that an "agreement" was in place with regard to the testing protocol and that the vessel's tanks had met the agreed criteria (color and hydrocarbons) at the time of cancellation.

The panel noted:

> It may be, as Owner submits, that PTT and chlorides are not included in the standard list of tests for a wall-wash before loading styrene, but the Panel is also mindful that tanks normally should be ready to load after two hours of Butterworth washing. . . . There may be, of course, instances where the cargo specifications are such that certain elements are crucial while others are less so, and that a charterer advises the vessel to focus the cleaning program on certain specific criteria.  However, we think this would require a very clear and express mutual understanding, and, in the absence of any such, as in the present case, a charterer cannot be restricted by . . . any other standard so long as the test(s) applied in ascertaining the condition of the tank(s) is/are reasonable and relevant.

The panel in that case hence directly addressed the argument made by Johnson that a change in testing (there, much more severe) should be charged against the charterer.  However, it disagreed, noting that it would "be helpful for the vessel representatives to have fixed targets and standards for their efforts."  There, the initial focus was on testing for hydrocarbons and color, but SGS decided to apply the "full battery" of tests to ensure safe carriage of the cargo. Nevertheless, the charterer's cancellation of the charter party was deemed justified. (Wanchoo Aff., Ex. 2, pp. 23-25).

In *American Heavy Lift Shipping Company of The United States And BP North America Petroleum, Inc.*, SMA No. 2522 (1988)(Ferrara, Sembler and Van Gelder), the owner argued that rejection of the tanks by SOMSA surveyors on three occasions was unreasonable.  It contended that the condition of the tanks prior to the voyage in question and subsequent thereto showed them to be suitable for the cargo.  The owner argued that the inspectors were unreasonable in their findings of sludge and cargo residues, and that the real reason for rejecting the ship was the cargo not being ready to load.  The owner did not deny the wording of Clause 18, that tanks should be cleaned to the satisfaction of the charterers, but argued that the clause "must be governed by a standard of reasonableness and sound judgment."

The dispute was whether "under the terms of the C/P, Owner or Charterer must bear the time and expense of tank cleaning."  The charterer pointed to Clause 18 Part II which specified that the tank were to be cleaned to the satisfaction of charterer's inspector.

In deciding for the charterers, the panel ruled, *inter alia*:

1.      The wording of Clause 18 Part II is standard verbiage contained in the printed ASBATANKVOY form of charter and as such must be construed as

written.  All the words have a meaning and without some specific evidence of intent to alter, amend or otherwise interpret them, they are to be given their true meaning.  The Panel considered whether the words "reasonable satisfaction" should be read into Clause 18.  Nothing in the clause permits such a conclusion. The question of competence of the inspector was also reviewed, but without some clear evidence that the inspector was clearly incompetent, it must be assumed that the appointee was able properly to perform his functions in a professional manner. . . .

(*Id.* at p. 31)

The Majority also overlooked that cancellation of a contract is an extreme measure – for there is no more serious a step a contracting party might take, and our courts have rightfully placed the burden on the party cancelling a contract to prove by a preponderance of evidence that it was entitled to do so.  *In the Matter of the Arbitration between Agrifos Fertilizer, Inc. and Transammonia, Inc.,* SMA No. 4049 (2009)(Ring, Sheinbaum and Martowski). (Wanchoo Aff., Ex. 2, p. 25).

Here, the Charter Party, Clause 18, provided, *inter alia*:

The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. . . .

Clause 41 provided:

Vessel to arrive at load port with all cargo tanks, pumps and pipes suitably clean to Charterer's Inspector's satisfaction in accordance with Clause 18 of this Charter Party, and further, Owner to ensure that all traces of sediment, tank washing or chemicals, if used, are removed from tanks, pumps and pipes intended for carriage of designated cargo.

(Charterer's Exhibit A).

(*Id.*)

In *Scanports Shipping, Inc. and Knud I. Larsen*, SMA No. 3020 (1993)(Berg, Zubrod and Engelbrecht), the charter called for the vessel to load 6,800/7,000 MT of

benzene from St. Croix (V.I.) in epoxy-coated tanks suitable for safe carriage to a U.S. Gulf port. The charterer's Cleaning Clause stipulated:  "Owner to ensure that all traces of sediment, tank washings or chemicals, if used, are removed from tanks, pumps and pipes intended for carriage of cargo." The vessel arrived at St. Croix where the SGS inspectors boarded the vessel and commenced tank examination.  Each inspector examined six tanks and all twelve were found unsuitable for loading benzene. The chief officer was served with SGS's formal notice rejecting the tanks based on its findings.  The rejection notice indicated a need for further extensive cleaning and the removal of scale containing the incompatible material.  The scope of the work was beyond the crew's capability, and the owners elected not to do it. Consequently, charterer notified the owner that the charter was cancelled because the vessel failed to tender a proper Notice of Readiness at St. Croix.  The charterer advised that they were holding the owner fully responsible for the freight differential in chartering a replacement vessel, as well as other possible costs and losses resulting from the breach. The Panel unanimously found that "owners failed to present a vessel which could load benzene in suitably clean cargo tanks" and awarded the charterer damages. (*Id.* at pp. 25-26).

In *Empresa Naviera Santa S.A., and Moore McCormack Bulk Transport, Inc.,* SMA No. 2755 (1991)(Bulow, Busch and Laing), the charterer argued that the only two questions were whether the owner breached the charter party by failing to tender a vessel suitable for loading its cargo, and, if so, to determine the quantum of damages to which it was entitled.

There, the owner was required, under the charter party, to present a vessel suitable to load the product contracted for.  The Panel determined that the "survey results were

quite telling and conclusive in this respect, and it is particularly noteworthy that both Charterer's and Owner's surveyors rejected the vessel."  "Simply stated," it concluded, "Owner was required to present a vessel suited for the carriage of clean gasoil, and did not.  Charterer's exercise of its right to cancel the charter party was thus entirely proper." (*Id.* at pp. 30-31).

In *Spartan Shipping, Inc. and Avin*, SMA No. 2120 (1985)(Berg, Webber and Scofield), the cleaning clause stated:  "Owners guarantee that they clean vessel tanks pipes according to Charterer's inspection satisfaction."  There, the panel concluded that the charterer acted properly in refusing to load a cargo on the vessel because it never achieved a state of cargo tank cleanliness to reasonably satisfy the charterer's inspector as required by the foregoing clause.  "The weight of the evidence leads us to conclude Owner breached its obligation under the cleaning clause when it failed to prepare the vessel's cargo tanks to a state required for the loading of JP-4." (*Id.* at p. 32).

In *Blystad Shipping & Trading, Inc. and Oceana Petrochemicals AG*, SMA No. 3319 (1997)(Arnold, Bulow, Laing), the charter party provided, at Paragraph 6, that a Notice of Readiness would be provided at customary anchorage at each port of loading or discharge; and, at section 16, that the vessel would arrive "with all cargo tanks, pumps, and pipes suitably clean to Charterer's Inspector's satisfaction . . . ." (Wanchoo Aff., Ex. 3, p. 2).

There, owner advised charterer that its cargo of methanol would be loaded in the vessel's cargo tanks nos. 2 center, 3 center and 4 port and starboard wing tanks.  Owner's operation department expressed concern to the vessel about the condition of the wing tanks, as previous cargoes had been gas oil and naphtha.  Charterer advised Caleb Brett

that the vessel was scheduled to arrive on May 19 to load 10,000 MT 5% more or less in

vessel's option, and gave instructions regarding all cleanliness tests for methanol to be

performed in accord with ASTM-1152-90, including a methanol wall-wash on all tanks.

Later, owner's broker asked charterer whether it would load some other product such as

xylene or toluene out of Curacao in case the vessel could not be cleaned enough to load

methanol.  Charterer told owner that if the vessel did not arrive at Jose, Venezuela in a

load-ready condition for methanol by 16:00 the following day, charterer would cancel.

The vessel arrived at Pozuelos Bay off Puero La Cruz on May 20, on which date a

NOR was issued stating that ship tanks nos. 2C, 3C, and 4PSW were in every way ready

to receive cargo.  Charterer took the position that the tendering of the NOR was invalid

as, *inter alia*, the vessel's tanks were not load-ready.  One of the surveyors testified that

no wall-wash tests could be conducted until the day after the NOR was issued.  On the

basis of the information given by the surveyor, charterer cancelled the vessel as not ready

to load.

The statement of facts showed that the cargo surveyor went on board at May 21,

and that the tanks were passed although no wall wash tests were performed on the tanks.

On May 25, the analysis of the initial wall-washing test was found off-spec.

There, owner admitted that, while the NOR was tendered on May 20, the vessel

was not ready because methanol could not have been loaded into two of the four

nominated tanks.  It argued, however, that the doctrine of substantial readiness should

apply, and that charterer used the alleged lack of readiness of the vessel as an excuse to

get out of a charter it did not wish to fulfill. (*Id.* at p. 3).

Charterer argued that the NOR tendered on May 20 was invalid because, *inter alia*, the cargo tanks were not in fact or law ready to receive cargo. It noted that the tank inspection and wall wash tests would have to be postponed until the following morning. "Subsequently, when the [vessel] berthed . . . , although . . . the Inchcape surveyor eventually passed Nos. 2C, 3C, and 4PSW tanks over 24 hours after the tender of the NOR . . . , Charterer underlines that no wall-wash tests were performed."

The panel deemed it "clear from the evidence that Owner knew that it could not possibly present satisfactorily clean tanks to [charterer] by the cancelling date." The Panel continued:

> . . . . When a party has to make a quick, commercial decision, such as cancelling a vessel under some time constraints, it cannot always research the situation and have complete information. It must make a decision. The evidence presented in this proceeding proves that [charterer]'s information was correct and that the tanks were not ready to load its cargo on May 20 . . . . Owner admitted that on May 20, steaming in two of the four . . . tanks completed at 15:30 at which time the tanks still had to be ejected to remove condensation and then be mopped dry. The Panel considered Owner's argument of "substantial readiness" and rejected it under the circumstances of this particular case. The Charterer eventually loaded its cargo on the [vessel] under a new agreement does not alter the fact that [charterer] was justified in cancelling the April 20, 1995 charter.

(*Id.* at p. 4)

In *Empresa Naviera Santa S.A., and Moore McCormack Bulk Transport, Inc.,* SMA No. 2755 (1991)(Bulow, Busch, Laing), a NOR was tendered, after which all tanks failed both visual examination and wall-wash tests for color drop. The vessel was rejected for loading gasoil. A broader survey was conducted by owner's surveyor, which resulted in a rejection of all tanks. One of the owner's arguments was that the charterer

wrongfully refused to permit the loading of a foot sample, which would have conclusively demonstrated the vessel's suitability for the cargo.

The panel unanimously found that the charterer rightfully cancelled the charter party.  "The survey results were quite telling and conclusive in this respect, and it is particularly noteworthy that both Charterer's and Owner's surveyors rejected the vessel." The panel found it "simpl[e that] owner was required to present a vessel suited for the carriage of clean gasoil, and did not.  Charterer's exercise of its right to cancel the charter party was thus entirely proper." (*Id.* at p. 5).

In *Fairy Tale Shipping Ltd. and Stolt-Nielsen Parcel Tankers, Inc.,* SMA No. 3388 (1997)(Arnold, Nichols, Carroll), the vessel tendered a NOR, after which the tanks failed wall-wash samples.  After numerous attempts by the owner to clean the tanks, the shipper cancelled the vessel and the charterer cancelled the charter.

There, the panel majority concluded that the charterer had the right to cancel the vessel for failure to present acceptable tanks for cargo within the agreed laydays.  While the vessel arrived and "tendered a separate NOR," that "became invalid because of vessel's inability to load the intended ethylene glycol parcel."  The Panel wrote:

> To carry this thought a step further, if the vessel had continued cleaning ad infinitum, what would have happened to Union Carbide's cargo and the terms under which the ethylene glycol was sold?  Would the cargo have been subject to the vessel-created delays without financial or commercial consequences?
>
> . . . . In this case, however, it was the vessel's inability to clean her tanks sufficiently for the designated cargo which caused the cancellation.
>
> . . . . The determination of the tanks' cleanliness was left to the sole discretion and judgment of Charterer's inspector, pursuant to Clause 18 of the applicable charter party.  The tanks were not clean and could have been cleaned for the carriage of fiber grade ethylene glycol.  The vessel was finally rejected for the

carriage of this parcel of cargo on May 19.  It was the consensus of all the
witnesses that zinc tanks are seldom suitable for the carriage of fiber grade
ethylene glycol, when the last cargo was a lube oil product. . . . He concluded
that the vessel's wing tanks were clean enough for loading a parcel of industrial
grade ethylene glycol, but that no degree of cleaning could have been performed
on the wing tanks which would have rendered them sufficiently clean to load a
parcel of ethylene glycol fiber grade.

*Id*. at 5.

The panel majority concluded that the "ultimate burden to bring a vessel's
qualifications or suitability in compliance with charterer's requirements lies with the
owner."  (Wanchoo Aff., Ex. 3, pp. 5-6).

In *Jo Tankers A/S and Ocelot Chemical*, SMA No. 2782 (1991)(Berg, Mordhorst,
Arnold), the vessel requested that the terminal supply 20 metric tons of methanol to assist
its tank cleaning effort, and this was done.  Tank cleaning continued at the anchorage and
tests were performed by SGS and owners' surveyor.  SGS issued a certificate of
cleanliness on the morning of December 24, 1983, attesting to the fact that the cargo
tanks passed the visual and wall wash tests and were ready for loading of one-foot
samples.

The vessel returned to the loading berth in the afternoon of December 24 and took
on one-foot samples in six of the center tanks.  The results were analyzed the following
day and SGS concluded that five of the six tanks were unfit for the carriage of methanol.
The owners' surveyor disagreed and concluded that all six tanks were clean and suitable
for the cargo.

In agreeing with the rejection of the tanks, the panel wrote:

Cargo tank cleanliness inspections are more of an art than a science.  They are the
subjective assessment of a surveyor noting existing and observed conditions as
applied to certain rules and guideline standards.  Competent and well-meaning

40

surveyors often arrive at different and conflicting conclusions, as they have here, but that does not necessarily mean one is more correct than the other.  In fact, we need not consider which of the two surveyors was more correct because the charter party makes it quite clear which inspector's judgment controls.  It is the charterer's inspector's decision to make, and unless he is totally unreasonable, capricious or derelict in this duties, that decision must stand.  We believe SGS and Beaton acted reasonably in arriving at the decision not to pass the [vessel]'s cargo tanks.

(*Id.* at pp. 6-7).

In *Pam Shipping Ltd. and Facto Inc.,* SMA No. 1289 (1979)(Powers, O'Riordan, Berg), a dispute arose out of a Tank Vessel Voyage Charter Party between PAM, as Owner, and FACTO, as Charterer of the M.V. PAM for the carriage of caustic soda solution from England to Japan.

The PAM had previously carried petroleum products preceding the caustic soda voyage; therefore, the tanks required a thorough cleaning.  Owner employed the Perolin Company to attend to and supervise the tank cleaning progress while the Vessel was en route from Hamburg to Eastham.  The cleaning process took three days.

On August 14, the PAM arrived at Eastham with her cargo tanks in a condition acknowledged to be satisfactory to the Perolin Company supervisors, and a report stating such stating this was issued. Before loading commenced, the shipper's surveyor inspected the tanks and certified that the tanks to be "in a clean condition to receive a cargo of Caustic Soda Liquor."

The vessel loaded 18,242.118 MT of caustic soda on August 15, and sailed that day for Japan.  On October 2, the PAM presented her Notice of Readiness at Japan, and, prior to discharge, her cargo was inspected by various surveyors acting for and on behalf of the interested parties.  The survey reports established that the cargo was heavily

contaminated and unsuitable in that its color had turned black, and a heavy petroleum odor was detected.

In that case, the following relevant provisions existed:

16.     The Captain is bound to keep the tanks, pipes, and pumps of the Vessel always clean. . . .

26.     Vessel to clean tanks, pumps, and lines to Charterers' surveyors' full satisfaction at Owners' time and expense.

Hence, the "central issue in th[at] proceeding" was "the true construction of Clauses 16 and 26 and their relationship to the Owner's undertaking of seaworthiness; . . . ."  One of Owner's arguments was that Clause 26 was an express undertaking for Charterer to inspect the cargo tanks and approve them for the loading of caustic soda.

Finding for the Charterer, the Panel noted, first, that Clause 16 – regarding the "always clean" language – was "simply a specific recitation of the shipowner's warranty of seaworthiness as otherwise stated in the charter party; that the vessel be in every way fitted for the voyage.

The warranty requires that the vessel and its appurtenances be in such a fit condition as to allow the vessel to safely carry the intended goods to their contemplated destination.  The obligation to provide clean and cargo-worthy tanks is absolute and is not merely limited to the exercise of due diligence as suggested by the Owner.

Hence, according to the Panel, the "always clean" language is merely a reiteration of the warranty of seaworthiness, which is contained in every charter party.  This answers – and undermines – Nordic's argument that the absence of the "always clean" clause here is somehow dispositive.

In PAM, the Owner argued that it was "relieved of the specific obligation to clean cargo tanks by the provisions of Clause 26" because the shipper's inspector, also acting

for the charterer, passed the tanks for loading.  "The Panel[, however,] d[id] not share th[at] view based on the wording of Clause 26, the charter party terms and conditions read as a whole, . . . ."  On that issue, the Panel wrote:

> Clause 26 establishes the shipowner's duty to clean the vessel's cargo tanks to the satisfaction of the Charterer's surveyor.  It also establishes Charterer's right to inspect the tanks prior to the loading of cargo and, if required, to reject the tanks as unfit for the loading of the cargo.   There is no absolute duty that such an inspection be carried out, or that if it is performed and approved by its inspector, that such a passage serves to relieve the vessel of its obligations to provide cargo-worthy tanks.  The more logical interpretation of Clause 26 is that it was inserted in the charter party to place an additional obligation on Owner to furnish clean tanks by superimposing onto the Clause 16 obligations an added right of Charterer to reject the tanks and, if necessary, require additional cleaning.  We find no way we can read into Clause 26 any intent to relieve Owner of its responsibility to furnish cargo-worthy tanks.  In fact, Clause 26 is complimentary to Clauses 1 and 16 of the obligation of seaworthiness they establish.

Finally, the Panel noted, the law allows an owner to contract away its obligation to provide a seaworthy and cargo-worthy vessel at commencement of the voyage, but, to do so, it must be clearly and evidently expressed.  The Panel did "not consider that Clause 26 rises to that standard. . . . if Clause 26 does anything at all, it provides an added inspection right to the Charterer." (Wanchoo Aff., Ex. 3, pp. 8-10).

In *Vorras Maritime Corp. and Agrico International Transportation, S.A.,* SMA No. 2207 (1986), the proceeding raised issues as to, *inter alia*, whether the charterer's inspector applied the proper standards in determining the suitability of the vessel's tanks for loading.  There, the witnesses all agreed that determination of a tank's suitability was ultimately a "judgment call" as to which reasonable men might differ.

There, "there [wa]s admittedly a considerable degree of leeway in determining" the tank cleanliness, the panel thought

> . . . that Clause 18 of the charter party left this determination to the Charterer's
> inspector and that his on-the-spot judgment should not be overruled by  arbitrators
> except on a clear showing that that the judgment was not properly exercised.

(*Id.* at p. 42).

These awards were squarely or nearly identically on point, and yet none of them were addressed by the Majority.

The Majority's Award here was in contravention of the above authority, all of which was briefed by ICC.  Its decision to disregard these awards, and the law they represent, demonstrated manifest disregard for the law.

## II.    The Panel Majority's Decision Was Arbitrary And Capricious

<u>Law</u>

In *Ainsworth v. Skurnick*, 960 F.2d 939 (11th Cir. 1992), the court recognized that an arbitral award that is arbitrary or capricious is not required to be enforced.  *Id.* at 941. An award is arbitrary and capricious if "a ground for the arbitrator's decision cannot be inferred from the facts of the case."  *Id.*

There, there was "simply no explanation in the award itself why damages were not awarded.

> The award said that "the Claimant sustained no damages; [a]nd, therefore, we
> conclude that the Claimant is not entitled to recover" damages.  This is a non-
> sequitur for which there is no basis.  The arbitrators did not reflect any
> disagreement with the court's statement of the law. . . . We have to assume that
> the arbitrators' decision was arbitrary and capricious for two reasons:  First, it was
> a reasonable interpretation of the statute made by the district court in questioning
> the vagueness of the panel's first decision; and, second, the district court told
> them what the law was, and their second award does not indicate that they differ
> with the point nor does it give any reason for not awarding monetary damages.
> Since they knew the law required damages, their refusal to grant damages is
> clearly arbitrary.  There was no reasonable basis on which the panel may have
> acted. . . .

*Id.*

44

<u>Application</u>

Here, it is respectfully submitted, that vacatur of the award is appropriate where the Panel Majority reached a conclusion that was arbitrary and capricious.  In addition to inventing and applying the wrong burden of proof, the Panel Majority's Award was premised on a willful ignorance of, or indifference to, the additional evidence that ICC obtained (on the Panel's insistence) from Exxon; as well as the fact that the Paraxylene was successfully loaded on other vessels and  barges immediately before and after the Clipper Karina's loading.

With respect to the request for additional information, the Panel Chairman specifically asked for the following:

THE CHAIRMAN:   . . . . .

What we would like by the way of additional information, whether it's available or not, is an attempt to get a schematic of the terminal as it existed when the CLIPPER called there which depicts the shore tank to the vessel side, that is the lines from the tank to the vessel side; was it a dedicated line?  We realize we've got some history behind us now, but the last time shore tank 9608 loaded cargo, cargo was loaded from that tank prior to the arrival of the CLIPPER; a schematic, if it's available, showing how the product moved from production to shore tank 9608; was it moved by pipe, which is probably likely, or railcar, whatever.

Taking a shot with ExxonMobil, whether any sampling or analytical documentary trail was available.  I think you already asked for that and the answer's been no.

And, lastly, from Rahul, the highlighted document that SGS, you referred to.

(Wanchoo Aff., Ex. 6, pp. 737-738).

Additional information was provided, as requested, by ICC by cover letter dated April 9, 2015. (Wanchoo Aff., Ex. 7). Therewith, ICC provided (1) a declaration from

Jonathan Nuckolls of ExxonMobil dated March 27, 2015, attesting to the good order and condition of the product at the time of loading; (2) test results of one foot and final samples from vessels which loaded immediately before and after the CLIPPER KARINA; (3) schematic showing how the paraxylene moved from production to storage tank 9608; (4) schematic showing how the paraxylene moved from storage tank 9608 to the vessel's berth (berth 2); (5) schematic of ExxonMobil's Beaumont terminal; (6) Dr. Sommer's report on the ExxonMobil terminal dated March 30, 2015; and (7) a clear copy of the SGS Loading Order Confirmation Form dated December 28, 2011. (*Id.*).

In spite of this additional, requested information, the Panel Majority ignores it in its Award.  Writing that there "is no evidence from where the cargo left the tank and entered the shore line" (Award, p. 31), the Majority continues to complain that the "Exxon January 5 sampling did not explain how the quality sample was taken" (*Id.*).  In fact, the additional information requested and provided specifically showed "from where the cargo left the tank and entered the shore line"; and the numerous other pieces of additional evidence went ignored by the Majority.

Additionally, it strikes as odd – minimally – that the Majority decision is written in first person narration.  For example, on Page 18, after referring to the Panel collectively, the Award's author writes, "I will focus on certain distinct but related issues, which, in my view, impact the decision" (Award, p. 18).  In footnote on the same page, the author writes, "I have used it as well" (*Id.* at n. 22).  On Page 22, the author writes, "in my opinion."  On Page 24, the author writes,  "I will refer to the narrative in the body of the award."

This remarkable change from reference to the Panel Majority collectively to one member singularly suggests that the Award was authored by one person alone and is reflective of his opinions.

But arbitrary and capricious is the Award where it willfully ignores significant pieces of evidence that undermine its reasoning.  First, it ignores that "the shore tank and live unit samples met all quality specifications, including the color specification at the time of loading." (Wanchoo Aff., Ex. 7, p. 3 ). Second, it ignores that the "paraxylene is first transferred from the "live" tank to a proving tank then once sampled and on test is transferred to the shore storage tank. The product is then loaded from the shore tank to the vessel via a direct dedicated line to the manifold" (*Id.* at n. 2), and "virtually assures that the product was delivered to the terminal manifold without any cross contamination." (*Id.* at p. 15). Third, it ignores that the test results of both the "1-F" (First Foot) and "Final" samples taken from the vessel that loaded immediately prior to and immediately after the Clipper Karina show that the product was on specification. (*Id.* at p. 6). Despite the overwhelming evidence that the Paraxylene supplied by Exxon to the Clipper Karina was on specification, the Panel Majority reached a conclusion that ICC did not meet its burden that the product supplied by Exxon was on specification.

The Majority's Award also disregarded the well-settled rule that the mitigation expenses incurred here for Nordic's breach, as presented in their Post-Hearing Brief:

The Charter Party provides at Clause 49:

Penalty for non-performance of this Charter Party shall be based upon proven amount of damages and reasonable costs of recovering same.

Actual expenses or losses reasonably incurred by the innocent party in mitigation of the ultimate loss are recoverable. *American Asiatic v. Robert Dollar Co.,* 282 F. 743

(9th Cir. 1922), *cert. denied*, 261 U.S. 615 (1923), *appeal after remand*, 25 F.2d 791 (9th Cir. 1928), *cert. denied*, 278 U.S. 639 (1928). (Wanchoo Aff., Ex. 2, p. 32).

      If it is the owner, rather than the charterer, who has breached the charter party, the basic rule of damages is the same:  Generally, the measure of damages is the difference between the cost of the cancelled charter and the actual cost of substitute performance. *The Ada,* 239 F. 363, 364 (S.D.N.Y. 1916), *rev'd on other grounds*, 250 F. 194 (2d Cir. 1918); *The Dryad*, SMA No. 703 (1972); *The West Fortune or Substitute*, SMA No. 3759 (2002).  Lost profits may be recoverable if no substitute vessel is available.  *See, Polar Steamship Cor. v. Inland Overseas SS. Corp.,* 136 F.2d 835 (1943). It has been held that the damages to be awarded to the charterer for the owner's failure to provide the vessel for service include (a) additional freight charges incurred by shipper in forwarding the cargo by another carrier; (b) expenses of holding the goods in the interim; (c) interest on the value of the goods during the period of delay in shipment; and (d) pre-judgment interest on each item to the date of the court's decree.  *Transpacific Lines Inc. v. Marianas Maritime Corp.,* 1979 AMC 1467 (D. Marianas Islands 1978); *Latina Trading Corporation and Astrolabe Bay Shipping Corporation*, SMA No. 1852 (1983) (Berg, Xistris and Vismans) (unanimously awarding storage costs incurred by charterer resulting from breach of charter party). (*Id.* at pp. 32-33).

      In *Scanports Shipping Inc.*, *supra*, the charterers were allowed the difference between the $15.00 freight rate on the vessel and the $20.50 rate they paid for the replacement vessel.  They were also granted the cost of additional SGS inspection. (*Id.* at p. 33).

A charterer's consequential damages flowing from an owner's breach of a charter are recoverable so long as they are reasonably foreseeable. *Northern Sales Co. Ltd. and Nedlloyd Bulk B.V.*, SMA No. 2688 (1990) (Jackson, Nelson and Berg); *Signmoil Resources N.V. v. Burnpac Transport and Trading Co.,* 1989 AMC 2874 (S.D.N.Y. 1989). It is enough that reasonable men in the position of the parties would have foreseen a loss as a probable result of the owner's breaches of the charter, and the losses in question resulted directly from its breaches. *Poseidon Schiffahrt GMBH and Columbia Shipmanagement Ltd.*, SMA No. 3785 (2003) (Bulow, Nichols and Carroll). In order to be recoverable, the exact nature and extent of a charterer's damages or expenses need not be foreseen. *Emerald Shipping Cor. and Elmhirst Pte.,* SMA No. 3987 (2007) (McCormack, Martowski and Sheinbaum). It is enough that some damages would likely result from an owner's breach of charter and the resulting delay, including additional discharge costs. *Id.* Consequential damages, which include earning losses, have also been awarded to charterers. *See, e.g., Colbro Ship Management Co., Ltd. and Marine Express Inc.,* SMA No. 3529 (1999) (Berg, Price and Engelbrecht). (*Id.* at pp. 33-34).

In *Northern Sales Co. Ltd., v. Nedlloyd Bulk, B.V.,* SMA No. 2688 (1990), a readiness date of March 3, 1984 and cancelling date of March 13, 1984 were in place. On March 13, the vessel arrived in New Orleans and the surveyors found extensive deterioration of the epoxy coatings in more than 50% of the cargo tanks. On March 14, the charterer cancelled the vessel and chartered another vessel. Loading was not completed until March 22. The letter of credit that was posted by STC (the buyer) in favor of the charterer contained a provision that required shipment by March 20. The

charterer's broker did not inform the owner's broker of the deadline and STC agreed to extend the date only if the charterer agreed to reduce the price by 0.5%. The charterer agreed, and then claimed the 0.5% against the owner when it failed to meet the shipping date. The owner argued that nothing should be payable because it was unaware of the time requirements of the sales contract, and that the reduction in sales price was not reasonable.

> There, the panel majority found for the charterer, stating

> . . . . it is well known in the trade that contracts for the sale of bulk food cargoes, especially to foreign governments, are frequently subject to time deadlines the violation of which can result in reductions in sales price and other financial penalties. This very issue was addressed by the panel in M/V Mary S., SMA 1355 (1979), which involved a shipment of grain to an Algerian government buyer. The owner failed to present its vessel for loading. In exchange for an extension of the shipment date, the grain buyer insisted on a reduction in the sales price. Although the owner (like the owner here) was not aware of the time requirements contained in the sales contract, the panel unanimously awarded damages to the charterer, writing: "It is surely not unforeseeable to contemplate that the failure of an Owner to tender the vessel under such circumstances requires a Charterer seller to incur additional expenses and enter into contract settlement adjustments because of late shipment. These words are equally applicable here.

 (Wanchoo Aff., Ex. 3, pp. 51-52).

In *Poseidon Schiffahrt GMBH and American Agip Co., Ltd.,* No. 3785 (2003)(Bulow, Nichols, Carroll), the issue was whether damages incurred as a result of a six-day delay in discharging the cargo at New York, including a price de-escalation penalty of $29,925.35, along with financial costs for a 5-day late payment were recoverable. The Panel majority stated:

> It is inconceivable that a sophisticated tanker operator, by its own admission, could not foresee that Charterer would incur damages because of a 6-day delay in discharging a cargo of gasoline, which could be subject to price fluctuations . . . .

The main issue with respect to the recovery of consequential damages is that of foreseeability.  Consequential damages may only be recoverable if foreseeable.  The damages should be a direct and natural consequence of the breach and rise from a direct and natural consequence of the breach and arise from the facts that were known or should have been known by the defendant.  As noted in *Fraser Shipyard and Industrial Centre Ltd. v. Expedient Maritime Company Limited,* 2000 AMC 543.  Foreseeability depends on the knowledge at least by the party who commits the breach, but the knowledge may be actual or imputed in a sense that a reasonable person or persons or business must be taken to know, in the ordinary course of their business dealings or business, what loss is liable to arise for a breach of contract in the ordinary course of business at p. 584, 585.  What must be foreseeable is that a loss would occur as a result of the breach of the contract, that reasonable men in the position of the parties would have foreseen a loss as a probable result of the breach.  In confirming the award in the M/V ELBE ORE, the judge noted, . . . .  What must be foreseeable is only that the loss would result if the breach occurred.  There is no requirement that the breach itself or the particular way that the loss came about be foreseeable at p. 2878.  The damages due to the delay in the delivery of the cargo were within the contemplation of the parties.

(*Id.* at pp. 52-53).

In *P. And C. Bituminous Coal, Inc. and Grundvig Chartering, Inc.,* SMA No. 2458 (1988), where the owner breached the charter by failing to tender a vessel.  The Panel awarded the charterer its proven losses, including loss of revenue, on a sales contract, "satisfied that P&C buyers demanded and obtained a price reduction of $8.00 per mt. for extending the contract shipment date.  This is an additional cost arising out of the breach that may properly be awarded to the injured party." (*Id.* at pp. 53-54).

 All of the above awards were briefed by ICC and disregarded by the Majority, which rendered an arbitrary and capricious decision.

**Conclusion**

For the foregoing reasons, ICC respectfully submits that the Award should be vacated and remanded with instructions that the Panel award ICC its damages which arose from Nordic's cancellation of the Charter Party.

Dated:  New York, New York
　　　　December 15, 2015

Respectfully submitted

By:　　/s/ Rahul Wanchoo　　　　　
　　　　Rahul Wanchoo
　　　　Aglaia Davis
　　　　Wanchoo Law Offices, LLP
　　　　350 Fifth Avenue, 59th Floor
　　　　New York, New York 10118
　　　　Phone:  (646) 593-8866
　　　　Fax:      (646) 355-0244
　　　　E-mail: rwanchoo@wanchoolaw.com

　　　　*Attorneys for Petitioner,*
　　　　*ICC Chemical Corporation*