```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 12, 2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
ICC CHEMICAL CORPORATION,                               :
                                                        :
                              Petitioner,               :    15 Civ. 9766 (KPF)
                                                        :
                  v.                                    :    OPINION AND ORDER
                                                        :
NORDIC TANKERS TRADING A/S,                             :
                                                        :
                              Respondent.               :
                                                        :
------------------------------------------------------- X

KATHERINE POLK FAILLA, District Judge:

Petitioner ICC Chemical Corporation has filed the instant motion to vacate an arbitration award issued in a dispute between Petitioner, which chartered a vessel for cargo shipment, and Respondent Nordic Tankers Trading A/S, which owned that vessel. Respondent has filed a cross-motion to confirm the arbitration award. For the reasons set forth in this Opinion, Petitioner's motion to vacate is denied, and Respondent's motion to confirm is granted.

## BACKGROUND[1]

### A.    Factual Background

On December 15, 2011, Petitioner ICC Chemical Corporation chartered the Clipper Karina (the "Vessel") to carry a shipment of Paraxylene that ICC

---

[1] The facts stated herein are drawn from the parties' submissions in connection with the instant motion, including Petitioner's Local Rule 56.1 Statement ("Pet. 56.1," Dkt. #11), and Respondent's responses thereto ("Resp. 56.1 Response," Dkt. #23); the exhibits attached to the Affidavit of Rahul Wanchoo ("Wanchoo Aff.," Dkt. #12); and the exhibits attached to the Declaration of Edward A. Keane ("Keane Decl.," Dkt. #14).

Petitioner's opening and reply briefs (Dkt. #13, 26) will be referred to using the conventions "Pet. Br." and "Pet. Reply," and Respondent's cross-moving and reply briefs (Dkt. #24, 27) will be referred to using the conventions "Resp. Opp." and "Resp. Reply."

had purchased from ExxonMobil ("Exxon"), by entering into a Charter Party Agreement (the "Agreement") with the Vessel's owner, Respondent Nordic Tankers Trading A/S. (Pet. 56.1 ¶¶ 1, 4). The parties agreed that the Vessel would be present at the port in Beaumont, Texas, ready to be loaded, by noon on December 31, 2011. (*Id.* at ¶ 6). Under the Agreement, the Vessel was to arrive at the Beaumont port with its tanks, pumps, and pipes cleaned to the satisfaction of Petitioner's inspector. (*Id.* at ¶ 10).

Respondent subsequently informed Petitioner that the Vessel would not arrive at the port until January 1, 2012, and accordingly requested an extension of the laydays to January 5, 2012. (Pet. 56.1 ¶ 20).[2] Exxon represented that it would suffer adverse tax consequences as a result of this delay, leading Petitioner to agree to pay a higher price for the cargo. (*Id.* at ¶¶ 23-24). A further extension of the laydays to January 7, 2012, was requested and received, and the Vessel arrived at the port on January 6, 2012. (*Id.* at ¶¶ 36, 38, 41).

---

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent … controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2] "Laytime, or laydays, is '[t]he period of time allowed to the charterer under the charter party for loading and unloading.'" *A/S Dampskibssetskabet Torm* v. *United States*, 64 F. Supp. 2d 298, 311 (S.D.N.Y. 1999) (citations omitted)

Petitioner's inspector boarded the Vessel and tested its tanks using the wall-wash method on January 6, 2012. (Pet. 56.1 ¶ 43). Later that same day, the Vessel failed pre-inspection due to three tanks being off-color and containing hydrocarbon. (*Id.* at ¶ 45). Several hours later, however, Petitioner's inspector returned to the Vessel and approved the three tanks in question. (*Id.* at ¶ 47).

On January 7, one foot of Paraxylene was loaded into a tank on the Vessel, and a sample from that first foot was subsequently tested and found to be "off color." (Pet. 56.1 ¶¶ 63, 65, 69). The Petitioner's inspector suggested that more Paraxylene could be added to the tank to dilute the off-color sample; Exxon, however, objected to blending the cargo. (*Id.* at ¶¶ 70-71). The Vessel was ordered back to the anchorage for tank cleaning. (*Id.* at ¶ 68).

On January 10, wall-wash samples taken by Petitioner's inspector were analyzed and failed for being off-color. (Pet. 56.1 ¶ 71). The inspector returned to the Vessel on January 10 to administer a second wall-wash test, and the tanks again failed. (*Id.* at ¶¶ 78-79). Respondent had an independent inspection of the tanks done on January 11, which the tanks similarly failed. (*Id.* at ¶¶ 80-82). The tanks failed a final wall-wash test conducted by Petitioner's inspector on January 13. (*Id.* at ¶ 88). Finally, that same day, the broker for the Agreement, SSY Chemicals ("SSY"), informed Petitioner on behalf of Respondent that, "[a]s the Vessel ha[s] performed three extended tank cleanings, and each time failed tank inspections, we have exceeded all options, and further tank cleaning is obsolete, wherefore we urgently ask [Petitioner] to

immediately cancel [the Agreement] without prejudice to either party." (*Id.* at ¶ 89). At this time, 36 tons of off-specification Paraxylene was reportedly on board the Vessel. (*Id.*).

After Petitioner stated that cancelling the Agreement would cause it to suffer significant financial loss, Respondent renewed its cancellation request, in response to which Petitioner cancelled the Agreement, "while 'reserving its rights' thereunder to claim all proven damages/losses/costs." (Pet. 56.1 ¶ 92). Petitioner then filed a claim in arbitration against Respondent, seeking damages for (i) Respondent's alleged failure to present a vessel with clean tanks, and (ii) cancellation of the Agreement. (Wanchoo Aff. Ex. 2 at 1).

Following five days of arbitration hearings on Petitioner's claims, the three-member arbitration panel (the "Panel") issued an award on September 22, 2015, with one panel member dissenting. (Wanchoo Aff. Ex. 1). The two members of the majority (the "Panel Majority" or "Majority") found that Petitioner's argument "that the root cause of [the Agreement's] cancellation" lay with Respondent was "certainly not supported by any of the undisputed facts." (Pet. 56.1 ¶ 110). Rather, the Majority found that "the 'record clearly show[ed] that [Respondent] made every possible effort to present a clean and suitable vessel," and that "the Vessel passed the wall-wash test on January 6 and was accepted for loading." (*Id.* at ¶ 119). The dissenting panel member (the "Dissent") disagreed with the Majority's factual findings, construing the case as one "in which a vessel was never clean enough to be able to load its intended cargo." (*Id.* at ¶ 120).

The Majority found that Petitioner's inspector had failed to conduct the necessary tests to determine whether the Paraxylene was contaminated prior to its loading; consequently, Petitioner did not meet its burden of proving the cargo's purity, and "could not do so because proper shore-line sampling could not [be] and was not done." (Pet. 56.1 ¶¶ 134-38, 151). The Majority was explicitly critical of the inspector's procedures, noting that "[i]n a business which relies on accuracy of quantity and quality, the files of [the inspector] … were incomplete, on occasion incorrect, and, in the case of [Petitioner's expert], mostly hearsay." (*Id.* at ¶ 142).[3] The Majority ultimately denied Petitioner's claims, awarding no damages, fees, or costs to either party. (*Id.* at ¶ 158).

## B.  Procedural Background

Petitioner filed its Petition to Vacate and Remand Arbitration on December 15, 2015. (Dkt. #1). It then filed its Motion to Vacate Arbitration on

---

[3]  *See also* Wanchoo Decl. Ex. 1 at 33-34, 38:

> The [production of the inspector, SGS,] in this arbitration was certainly not helpful to clarify matters; the reluctance to come forward with full disclosure for its client, ICC, is troubling. Once again, SGS appeared to have decided that Exxon, the other client, was entitled to be shielded. Arbitrators are looking for the truth. They want to know, especially from an involved third party; *i.e.*, SGS; who did what, who said what and why. It is an often-used truism that if you are right, you should prevail, but if you do not have the necessary proof, which you could have presented, then you fail.
>
> The SGS contribution to ICC's case is reminiscent of "who's on first, what's on second." There is a degree of obfuscation in the SGS production, which is unacceptable.
>
> ***
>
> As far as the majority is concerned, this is a burden of proof case in which ICC needed to show that the cargo supplied by Exxon, supported by an SGS shore line sample analysis, was on specification. ICC did not and could not meet this burden because proper shore line sampling could not [be] and was not done.

5

December 17, 2015. (Dkt. #6).  On December 23, 2015, the Court issued an Order stating that "[p]roceedings to vacate an arbitration award must be 'treated as akin to a motion for summary judgment,' *D.H. Blair Co.* v. *Gottdiener*, 462 F.3d 95, 109 (2d Cir. 2006)," and accordingly ordered Petitioner to move for vacatur via a motion for summary judgment in accordance with Federal Rule of Civil Procedure 56.  (Dkt. #8).

Petitioner filed its motion for summary judgment on January 5, 2016. (Dkt. #10, 13).  Respondent filed its opposition papers on January 22, 2016, simultaneously cross-moving for confirmation of the arbitration award.  (Dkt. #15, 16).  Petitioner filed its reply and response in a single brief on February 5, 2016 (Dkt. #26), and Respondent concluded the briefing with its reply in support of its cross-motion on February 12, 2016 (Dkt. #27).

## DISCUSSION

**A.   Applicable Law**

**1.   Confirmation or Vacatur of Arbitral Awards**

The Second Circuit has "repeatedly recognized the strong deference appropriately due arbitral awards and the arbitral process, and has limited its review of arbitration awards in obeisance to that process." *Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007).  "To encourage and support the use of arbitration by consenting parties," the Court "uses an extremely deferential standard of review for arbitral awards."  *Id.* at 139.

Generally speaking, courts in this Circuit will vacate an arbitration award "only upon finding a violation of one of the four statutory bases [enumerated in the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1-16 (Chapter One), 201-208 (Chapter Two), 301-307 (Chapter Three)], or, more rarely, if [the court] find[s] a panel has acted in manifest disregard of the law." *Porzig*, 497 F.3d at 139; *accord Zurich Am. Ins. Co.* v. *Team Tankers A.S.*, 811 F.3d 584, 588 (2d Cir. 2016).[4]  In short, a party seeking vacatur of an arbitrator's decision "must clear a high hurdle." *Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010); *see also STMicroelectronics,*

---

[4]  The four statutory grounds for vacatur encompass those situations in which:

> (i)   the award was procured by corruption, fraud, or undue means;
>
> (ii)  there was evident partiality or corruption in the arbitrators, or either of them;
>
> (iii) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (iv)  the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

Additionally, an arbitral award may be vacated for manifest disregard of the law, but "only where a petitioner can demonstrate both that [i] the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and [ii] the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case." *Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007) (internal quotation marks omitted).  The "manifest disregard" standard, first announced in *Wilko* v. *Swan*, 346 U.S. 427, 436-37 (1953), was later called into question in *Hall Street Assocs., L.L.C.* v. *Mattel, Inc.*, 552 U.S. 576, 585 (2008) ("Maybe the term 'manifest disregard' was meant to name a new ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than adding to them.").  However, after the Supreme Court expressly declined to consider the vitality of the manifest disregard standard in *Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010), the Second Circuit has "continued to recognize that standard as a valid ground" for vacatur of an arbitration award, *Schwartz* v. *Merrill Lynch & Co., Inc.*, 665 F.3d 444, 452 (2d Cir. 2011).

*N.V.,* v. *Credit Suisse Sec. (USA),* 648 F.3d 68, 74 (2d Cir. 2011) ("the showing required to avoid confirmation is very high"). "The arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case. Only a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award." *D.H. Blair & Co.*, 462 F.3d at 110 (internal citations and quotation marks omitted).

In contrast to vacatur of an award, confirmation of an arbitration award is generally "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected." *D.H. Blair & Co.*, 462 F.3d at 110 (internal quotation marks omitted, quoting 9 U.S.C. § 9); *accord Hall Street Assocs., L.L.C.* v. *Mattel, Inc.*, 552 U.S. 576, 582 (2008).

### 2. Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 322 (1986); *see also Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

**B.     Analysis**

Petitioner argues that the Award should be vacated due to the Panel Majority's "manifest disregard of the law." (Pet. Br. 3-15).[5] In order for a court to vacate an arbitration award under the judicially-created "manifest disregard of the law" theory, it is not enough that the arbitration panel erred in its application of the law, or that a reasonable arbitrator could have reached a different result: Rather, (i) the "governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable," and (ii) the arbitrators must have "appreciate[d] the existence of a clearly governing legal principle but decide[d] to ignore or pay no attention to it." *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Bobker*, 808 F.2d 930, 933-34 (2d Cir. 1986); *accord D.H. Blair & Co.*, 462 F.3d at 111. Petitioner falls at the first hurdle.

Petitioner contends that the Panel Majority violated "well defined, explicit, and clearly applicable" law by misallocating the burden of proof during the arbitration proceeding. (Pet Br. 4-15). To that end, Petitioner posits the following legal principles: Where a dispute centers on contaminated cargo, the shipping party bears the burden of showing that its cargo was not contaminated prior to loading; however, where a dispute regards the fitness of a vessel, the burden is on the vessel's owner to show its due diligence in presenting a fit vessel. (*Id.* at 4-5). *See also* 80 C.J.S. SHIPPING § 366 ("The

---

[5]     Petitioner's opening memorandum additionally argued that the Majority's decision should be overturned as "arbitrary and capricious." (Pet. Br. 16-22). However, in light of the Second Circuit's rejection of "arbitrary and capricious" as an independent ground for vacatur of an arbitration award, Petitioner has withdrawn this argument. (Pet. Reply 15). *See Porzig*, 497 F.3d at 139 (rejecting an award's "arbitrary and capricious" nature as an independent ground for vacatur).

burden is on the plaintiff or libelant to prove that the goods were in good condition or were free of the damage complained of when delivered to the carrier."); *GTS Indus. S.A.* v. *S/S "Havtjeld,"* 68 F.3d 1531, 1535 (2d Cir. 1995) (finding the burden on a ship owner to prove its due diligence in providing a seaworthy vessel, but that "a two hundred year old distinction has existed as to who has the burden of proof regarding seaworthiness [itself]. In the case of a common carrier the shipowner is statutorily so burdened, whereas under private arrangements where parties are free to regulate their rights with respect to one another, proof of the breach of obligation or duty to provide a seaworthy vessel rests upon the shipper asserting it as a basis for recovery."). Additionally, Petitioner asserts that where a party cancels a contract, the cancelling party bears the burden of showing that it was entitled to do so. (Pet Br. 4). Respondent does not disagree with Petitioner's characterization of the law. (*See generally* Resp. Opp.).

Applying these principles to the instant matter, Petitioner contends that the Panel Majority found the dispute not to be a "contamination case," yet nevertheless required Petitioner to "show that the cargo supplied by Exxon … was on specification," rather than placing the burden on Respondent to show its due diligence in providing a seaworthy ship. (Pet. Br. 4-5; Pet. Reply 4, 9). In so doing, however, Petitioner mischaracterizes the Panel Majority's findings; in particular, it excerpts the Majority's statement that this is "not a COGSA [Carriage of Goods by Sea Act, 46 U.S.C. § 30701] cargo case" without supplying the relevant context from the Award. (Pet. Br. 6). The sentence from

11

which this quote was excerpted provided in full, "Generally, the panel is in agreement that this matter is not a COGSA cargo case, but rather considers it a dispute relating to a vessel's suitability to load the designated cargo (as argued by [Petitioner]) or the quality of the cargo supplied by Exxon under the ICC charter (as contended by [Respondent])." (Wanchoo Aff. Ex. 1 at 18). In other words, the Majority's finding that it was "not a COGSA cargo case" did not determine whether the case centered on the Vessel's fitness, as contended by Petitioner, or on contamination, as contended by Respondent.

Moreover, the Majority then went on to find that Respondent "made every possible effort to present a clean and suitable vessel," and that the Vessel was in fact "accepted for loading" — an action that one of Petitioner's own cited arbitration awards found would waive any further pre-loading inspection. (Wanchoo Aff. Ex. 1 at 25). *See Orix Maritime Corp., As Disponent Owners of the M/T Brage Vibeke* v. *Chemlube S.A.*, SMA No. 3073, 1994 WL 16779976, at *4 (May 12, 1994) ("In the real world, Shippers' decision to purge the tanks and to commence loading of foot samples … constitutes a waiver of any further pre-loading inspection option Saybolt may have had."). Thus, contrary to Petitioner's assertion, the Majority clearly found the parties' dispute to center on the cargo's contamination, rather than on the fitness of the Vessel. Having made that predicate determination, the Majority then applied what Petitioner agrees to be the proper legal standard: It required Petitioner to bear the burden of showing that the cargo was not contaminated when it was loaded onto the

Vessel, a burden that the Majority found Petitioner had failed to carry. (Wanchoo Aff. Ex. 1 at 31-38).

Ultimately, the Majority determined that "this is a burden of proof case in which [Petitioner] needed to show that the cargo supplied by Exxon … was on specification. [Petitioner] did not and could not meet this burden because proper shore line sampling could not [be] and was not done." (Wanchoo Aff. Ex. 1 at 38). Petitioner's memorandum in support of its motion supplies numerous examples of arbitration awards in which a vessel owner was held liable for its failure to provide a seaworthy vessel (Pet. Br. 6-16); but, as just explained, the Majority found no proof in the record that Respondent had in fact failed to produce a seaworthy vessel. Consequently, the proper allocation of responsibility for ensuring a vessel's fitness is irrelevant, and, contrary to Petitioner's argument, the Majority's failure to address the awards cited by Petitioner does not indicate its "manifest disregard" for the legal principles they embody. (*Id.* at 16).

The Court turns next to Petitioner's contention that the Majority erred by failing to require Respondent, the cancelling party, to prove that it was entitled to cancel the Agreement. But the Majority found that Respondent "asked [Petitioner] to cancel the charter party," and that "[Petitioner] responded … with *its cancellation.*" (Wanchoo Aff. Ex. 1 at 26 (emphasis added)). In other words, the Majority found that Petitioner cancelled the Agreement. Once again, Petitioner's contention that the Majority did not hold Respondent to the appropriate burden of proof is not, in fact, an argument that the Majority

13

disregarded the law, but rather is an expression of Petitioner's disagreement with the Majority's factual finding that Petitioner cancelled the contract. Such disagreement is not grounds for vacatur of an award.

Finally, Petitioner repeatedly argues that the Majority's use of the first-person singular in its Award evidences procedural error, as it indicates that the Award represents only one individual Arbitrator's view. (Pet. Br. 18-19; Pet. Reply 2, 16, 18). The Award was, however, signed by each member of the Panel. (Wanchoo Aff. Ex. 1 at 41). Petitioner does not argue, and the record does not suggest, that those signatures were fraudulently obtained. Consequently, the Majority's stylistic choice — while perhaps somewhat unorthodox — has no bearing on the Award's validity.[6]

Because the Court finds that the Panel Majority did not objectively disregard clearly applicable law, it need not proceed to the companion question of whether the Majority consciously chose to do so.

## CONCLUSION

For the reasons stated in this Opinion, Petitioner's motion to vacate the arbitration award is DENIED; and Respondent's cross-motion to confirm the award is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

---

[6] The Court notes the somewhat analogous context in which "a written contract is expressed in the first person singular, but the contract is signed by several persons"; there, the signatories "are jointly and severally bound in the absence of express words in the instrument to the contrary." RESTATEMENT (FIRST) OF CONTRACTS § 115 (1932); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 289 (1981), cmt. c.

SO ORDERED.

Dated:     May 11, 2016
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge